IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 11, 2005 Session

## STATE OF TENNESSEE v. CLINTON BURNS, III

**Appeal from the Criminal Court for Knox County**
**No. 78802      Ray L. Jenkins, Judge**

**No. E2004-01632-COA-R3-JV  - FILED JULY 29, 2005**

Clinton Burns, III, (DOB: 06/07/86), a juvenile, was adjudged delinquent by the Knox County Juvenile Court, having been found to have committed the adult offense of aggravated robbery. He appealed to the trial court, which, after a bench trial, affirmed the judgment of the juvenile court. The defendant appeals, contending that the trial court erred in denying his motion to suppress the testimony of the victim because of the unduly suggestive nature of the procedure used to identify him. He further argues that the trial court erred in refusing to afford him a jury trial. We hold that the trial court properly denied the defendant's motion to suppress, but that it erred in denying the defendant a jury trial. Accordingly, we affirm the trial court's order denying the motion to suppress, but reverse the judgment of the trial court affirming the judgment of the juvenile court. Case remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court
Affirmed in Part; Reversed in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Mark E. Stephens, District Public Defender; and Robert C. Edwards, Assistant Public Defender, Knoxville, Tennessee, for the appellant, Clinton Burns, III.

Paul G. Summers, Attorney General and Reporter; and John H. Bledsoe, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

### OPINION

I.

On September 23, 2003, the Check Cash Store on Broadway in Knoxville was robbed at gunpoint. After the robber fled the scene, Teshia Clapp, the store clerk, called the police. Officer Joseph Huckleby of the Knoxville Police Department responded to the scene where he met with Ms. Clapp and obtained a description of the suspect. Officer Huckleby learned from another officer –

Officer Susan Coker – that the defendant had left Fulton High School earlier that morning and that he matched the description furnished by Ms. Clapp.

Since the defendant is a juvenile, Officer Huckleby contacted his parents. The defendant's mother brought him to the police station, where he was fingerprinted and photographed. The crime technicians used his photograph as a part of a computer-generated photographic line-up, which contained the photographs of the defendant and five other black males, two of whom, including the defendant, had skin of a darker complexion than that of the other four.

Officer Huckleby showed the photographic line-up to Ms. Clapp and asked her if she could identify the individual who robbed the store. Ms. Clapp picked out the defendant, circled his photograph and signed her name below his photograph. Following this, Officer Huckleby indicated that, based on Ms. Clapp's identification, he intended to formally arrest the defendant who was already at the police station. He told Ms. Clapp that he was going to take the defendant into custody, and that this would require him to move the defendant from one part of the police station to another. The room in which Ms. Clapp was located had a two-way window. When Officer Huckleby walked with the defendant in front of the window, Ms. Clapp identified him as the individual who had robbed the store.

There is some dispute in the record regarding Officer Huckleby's conversation with Ms. Clapp prior to the time that he passed in front of the window with the defendant. Both of them testified at the suppression hearing. Ms. Clapp testified as follows:

> A. After I did the [photographic] lineup, when the detective had taken it, he hadn't came back and thanked me or anything, 'cause I picked the one and then he left. And he came back and *he asked* me if I would mind looking at an individual that walked by to see if that was the same person. When he walked by, that was the same guy. I had a panic attack in the Police Department in a little, closed window room when he walked by.

(Emphasis added). On the same subject, Officer Huckleby testified thusly:

> Q. Now, you told her – when she asked you if she could see him in person, you told her, no, absolutely not, that wouldn't be right?
>
> A. That's exactly what I told her. Now, there was conversation after she picked him out of a photo lineup, and I told her that I had to go get him. And *she asked* could she see him, and I told her, no, but I said you'll probably see him when I bring him on the other side of the room. . . .

(Emphasis added).

On September 24, 2003, the State filed a petition in the Knox County Juvenile Court charging the defendant with committing the delinquent act of aggravated robbery. A juvenile court referee found the defendant to be delinquent. The defendant appealed to the trial court. The defendant subsequently filed a motion to suppress the victim's identification of him. This motion was denied.

The State subsequently filed a motion contending that the defendant was not entitled to a jury trial in his *de novo* appeal from the juvenile court.[1] The trial court granted the State's motion. Thereafter, the defendant was tried before the criminal court judge on June 3, 2004, and June 9, 2004. At the conclusion of the trial, the court found the defendant guilty of aggravated robbery beyond a reasonable doubt. The defendant appeals.

II.

The defendant presents two issues for our review: (1) whether the trial court erred in denying his motion to suppress Ms. Clapp's identification; and (2) whether the trial court erred in denying him a jury trial.

III.

A.

With respect to the motion to suppress, the defendant argues that the trial court erred in denying his motion because, according to him, the procedure used to identify him was unduly suggestive.

In reviewing a trial court's ruling on a motion to suppress, we must uphold the court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). It is incumbent upon the trial court as the trier of fact to assess witness credibility, the weight and value of the evidence, and the resolution of conflicts in the evidence. *Id.* As to the trial court's application of the law to the facts, however, we review that application *de novo*, according no presumption of correctness to the court's conclusions. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

B.

"To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998) (citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). It therefore follows that any

---

[1]The Tennessee Supreme Court has held that a juvenile defendant in his or her appeal to criminal court does not have to affirmatively ask for a jury trial. *See State v. Johnson*, 574 S.W.2d 739, 741 (Tenn. 1978).

identification procedure initiated by the police that is impermissibly suggestive and gives rise to a "very substantial likelihood of irreparable misidentification" violates a defendant's due process rights. ***State v. Loveday***, No. E1999-01090-CCA-R3-CV, 2000 WL 1337658, at *4 (Tenn. Crim. App. E.S., filed September 18, 2000) (citing ***Simmons***, 390 U.S. at 384, 88 S.Ct. at 971).

Law enforcement officers employ a variety of identification techniques. One such procedure is referred to as a "showup" or a one-on-one confrontation. A "showup" occurs when a suspect or a single photograph of that individual is presented to a victim or other witness. ***Cribbs***, 967 S.W.2d at 794. Generally speaking, we have condemned showups as being "inherently suggestive and unfair to the accused." ***State v. Thomas***, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). Both the United States Supreme Court and our state appellate courts have limited the use of such "showups" to situations where (1) there are imperative circumstances necessitating the procedure, or (2) the showup occurs as an on-the-scene investigatory procedure following the commission of the crime. ***Id.*** (citations omitted).

It is clear beyond any doubt that Officer Huckleby knew that he was going to be walking the defendant past the window of the room where Ms. Clapp was located. Furthermore, it is clear that Ms. Clapp knew that the defendant was going to be moved in front of that window. Against this background, we must determine if Officer Huckleby's movement of the defendant in front of the window was "impermissibly suggestive." *See **id.*** at 382. If so, we must then determine if it "create[d] a very substantial likelihood of irreparable misidentification." ***Id***. In making this latter determination, we must decide if the witness's identification is still reliable based on the totality of the circumstances surrounding the identification. ***Id***. We apply the following factors established by the United States Supreme Court for assessing the reliability and admissibility of a witness's identification: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty that the witness demonstrates at the confrontation; and (5) the time between the crime and the identification. ***Id.*** (citing ***Neil v. Biggers***, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)). These factors are weighed against the corrupting effect of a suggestive procedure. ***State v. Strickland***, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993).

With these principles in mind, we turn to the facts of the instant case. When the victim arrived at the police station, she was handed a photographic line-up that contained six photographs. All six photographs were of black men, although two were darker-skinned than the other four. When the victim reviewed the photo array, she identified the defendant as the person who held her up. Although the line-up consisted of four light-skinned blacks and two dark-skinned blacks, Ms. Clapp stated that the difference in skin color did not impact her identification of the defendant.

Prior to the photographic line-up, the victim asked to see the individual in custody. Officer Huckleby informed her that they no longer conducted line-ups where a witness is afforded the opportunity to see a suspect in person. Consequently, he told her that she could not see the individual he was holding. As previously noted, however, the officer told her that she would probably see him because he had to walk the defendant from one end of the office to the other, and, in so doing, would pass in front of the room where she was located. The victim testified that Officer

-4-

Huckleby specifically asked her if she would be willing to look at the suspect as he walked in front of the window. She also testified that she wanted to see the defendant in person in order to confirm her identification. When the defendant passed by the room, she recognized him as the perpetrator of the hold-up and, as a consequence, had a panic attack.

Based upon our review of the evidence, we conclude that the showup was unduly suggestive. Not only did Officer Huckleby inform the victim that the defendant would be walking by the room in which she was located, he escorted the defendant *after* he had been handcuffed. Presenting a handcuffed suspect for identification has been deemed a practice that is unnecessarily suggestive. *See Webb v. Havener*, 549 F.2d 1081, 1086-87 (6th Cir. 1977); *State v. Beal*, 614 S.W.2d 77, 81 (Tenn. Crim. App. 1981). The officer testified that there was no secure area in which to place the defendant; however, he placed the victim in a room with a window, thereby enabling her to see the defendant. Furthermore, the officer did not explain why the witness could not have been placed in another room and thereby avoid this showup. We further find that the showup conducted by the officer was "unnecessarily" suggestive. This was not a case where the showup was justified due to imperative circumstances or an on-the-scene investigatory procedure. *See Thomas*, 780 S.W.2d at 381.

Despite our determination that the showup was suggestive, we cannot say that Ms. Clapp's identification was unreliable so as to warrant the granting of the defendant's motion to suppress the identification. In reaching this conclusion, our underlying analysis is undertaken pursuant to the previously-noted factors set forth in *Neil v. Biggers*. First, we find that the victim had a sufficient opportunity to see the perpetrator. She saw the defendant when he entered the store. His face was not covered as he approached her. It was morning and the room was illuminated by fluorescent lights. The description that she was able to furnish to Officer Huckleby evinces her degree of attention. For example, she reported to the officer that he was wearing a black t-shirt, black jeans, a black toboggan, had braided hair, and was approximately five feet, nine inches tall. In general terms, her description of the robber's facial features was consistent with the photograph of the defendant. Furthermore, the photographic identification occurred less than 24 hours from the time of the incident. The victim testified that she was "positive" of her choice of the defendant in the photo array. However, she also testified that she wanted to see the defendant in person to confirm that she had, in fact, selected the correct person. We find that this does not detract from her level of certainty as to her identification of the defendant. Accordingly, we cannot say that there was a "very substantial likelihood of irreparable misidentification." *Cribbs*, 967 S.W.2d at 794. We therefore find that the trial court did not err in denying the defendant's motion to suppress.

IV.

The defendant also argues that he was improperly denied his right to a jury trial on his appeal from juvenile court to criminal court. As this issue presents a question of law, we review the trial court's judgment *de novo*, according no presumption of correctness to its findings. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

-5-

The first case in Tennessee to address this matter, *i.e.* whether a juvenile defendant has a constitutional right to a jury trial where the charge of delinquency was predicated on a felony offense, was *Arwood v. State*, 463 S.W.2d 943 (Tenn. Ct. App. 1970). There we held that a juvenile defendant did possess such a right. *Id.* at 946. Relying on United States Supreme Court precedent, we noted the High Court's recognition of rights to be afforded to juveniles in delinquency proceedings that were comparable to those afforded to criminal defendants. *Id.* at 945. For instance, we cited a case where the Supreme Court had held that juveniles charged with criminal acts were entitled to constitutional safeguards such as timely notice of the charges, a right to counsel, and a right against self-incrimination. *Id.* (citing *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). In keeping with the Supreme Court's extension of various rights to juveniles, we extended the right to a jury trial on appeal to juveniles charged with delinquency predicated on the commission of a felony. *Id.* at 946.

The following year, the United States Supreme Court released its decision in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), a case that was pending before the High Court at the time we decided *Arwood*. In *McKeiver*, the Court held that a juvenile does *not* have a federal constitutional right to a jury trial. *Id.* at 545, 1986. The court articulated a number of reasons for its decision, including, among others, that the Court had declined to extend all rights of adult defendants to juveniles, that such a ruling could have an adverse impact on juvenile proceedings, and that several states, in light of earlier Court precedent, had determined that the Federal Constitution did not confer a right to a jury trial to juveniles. *Id.* at 545-50, 1986-89. However, in the course of its discussion, the Court noted a limitation on its holding, stating that

> [i]f, in its wisdom, any State feels the jury trial is desirable in all cases, or in certain kinds, there appears to be no impediment to its installing a system embracing that feature. That, however, is the State's privilege and not its obligation.

*Id.* at 547, 1987.

Although we did not have the benefit of *McKeiver* when we decided *Arwood*, the appellate courts of this state have had several opportunities to revisit our decision in *Arwood* and, despite *McKeiver*, have, at least tacitly, upheld the ruling in *Arwood*. In *State v. Johnson*, 574 S.W.2d 739, 740 (Tenn. 1978), the Tennessee Supreme Court addressed the issue in the context of deciding whether or not a juvenile must exercise his demand for a jury trial when appealing his delinquency finding to a circuit court. The High Court cited *Arwood* in the context of our discussion of the rights of juveniles in delinquency proceedings, noting that although delinquency proceedings are akin to civil matters in some respects, the juvenile has a right to counsel, a right of confrontation, a privilege against self-incrimination, and the right to have guilt established beyond a reasonable doubt. *Id.* at 741 (citing *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). The Tennessee Supreme Court ultimately held that since an adult is entitled to a jury unless he explicitly waives that right, similarly, a juvenile who fails to request a jury trial should not be deprived of one. *Id.* Although *Arwood* was not discussed at

length, it was cited for the proposition that a juvenile is entitled to a jury trial on his appeal to the circuit court.

The interplay between *Arwood* and its progeny and *McKeiver* is most clearly stated in the Supreme Court's opinion in *State ex rel. Anglin v. Mitchell*, 596 S.W.2d 779 (Tenn. 1980). The issue before the *Anglin* court was whether a judge who was not a licensed attorney could adjudicate delinquency. *Id.* at 780. One of the issues addressed in the opinion was the State's argument that our state Supreme Court was bound by United States Supreme Court precedent. *Id.* at 788. In discussing the jurisdiction of the Tennessee Supreme Court in relation to that of the United States Supreme Court, our Supreme Court used the interplay between *McKeiver* and *Johnson*, which latter case affirmed *Arwood*, to demonstrate the impact of United States Supreme Court precedent:

> While we accord great deference to the Supreme Court of the United States and abide, without question, its declarations denouncing deviations from the Constitution of the United States, this does not relieve this Court from the sworn obligation to subject any given question to analysis and examination in the light of the Constitution of Tennessee, designed to determine whether our own constitution requires a greater protection.
>
> Thus, although the Supreme Court in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), held that the Due Process Clause of the Fourteenth Amendment did not assure the right to a jury trial in the adjudicatory phase of a state juvenile court, this Court, in *State v. Johnson*, 574 S.W.[2d] 739 (Tenn. 1978), declared that a juvenile "charged with an offense which would constitute a felony" is entitled to a jury trial on appeal to the Circuit Court for a *de novo* trial.

*Id.* at 789. The Court further delineated its responsibility to the Tennessee Constitution relative to the Federal Constitution, stating that

> [a] state court can not under a state constitution restrict the rights of its citizens contrary to the rights granted by the Federal Constitution; but a state court can grant to its citizens broader and more comprehensive rights under the state constitution than as allowed by the Federal Constitution.

*Id.* (quoting *Merchants Bank v. State Wildlife Resources Agency*, 567 S.W.2d 476, 479 (Tenn. Ct. App. 1978)).

We find that our Supreme Court's statements in *Anglin* are a complete answer to the matter before us. Although the United States Supreme Court held in *McKeiver* that the *Federal Constitution* does not oblige states to furnish jury trials to juveniles, the Court clearly stated that it

was within an individual state's discretion to determine if it would extend the right to a jury trial to juveniles. *McKeiver*, 403 U.S. at 548, 91 S.Ct. at 1987. Therefore, as evidenced by the discussion of the cases herein, it is clear to us that the Tennessee Supreme Court has determined that *under the Tennessee Constitution*, juveniles are entitled to a jury trial upon appeal to the circuit or criminal court.

The State argues that the Tennessee Supreme Court's language cited herein is merely dicta and therefore should not be binding on this court. In fact, the State goes so far as to delineate the difference between obiter dictum and judicial dictum, arguing that our Supreme Court's statements affirming the holding of *Arwood* are obiter dictum.[2] Therefore, so the argument goes, it is not binding precedent. We find this argument to be without merit. As our Supreme Court has stated ,

> trial courts must follow the directives of superior courts, particularly when the superior court has given definite expression to its views in a case after careful consideration. Accordingly, inferior courts are not free to disregard, on the basis that the statement is *obiter dictum*, the pronouncement of a superior court when it speaks directly on the matter before it, particularly when the superior court seeks to give guidance to the bench and bar. To do otherwise invites chaos into the system of justice.

*Holder v. Tennessee Judicial Selection Comm'n*, 937 S.W.2d 877, 881-82 (Tenn. 1996) (internal citations omitted). We understand our role as an "inferior court." We cannot ignore that which our Supreme Court has clearly delineated.

We therefore hold that under the Tennessee Constitution, a juvenile is entitled to a jury trial on appeal of his or her delinquency proceeding to the circuit or criminal court. Accordingly, we find that the trial court erred when it denied the defendant a jury trial.

V.

The order of the trial court denying the motion to suppress is affirmed. The judgment of the trial court affirming the juvenile court's finding of delinquency is reversed and this matter is remanded to the trial court for a new trial. Costs on appeal are taxed to the State of Tennessee.

_____

CHARLES D. SUSANO, JR., JUDGE

---

[2]"Obiter dictum" is generally defined as "a remark or opinion uttered by the way." *Staten v. State*, 232 S.W.2d 18, 19 (Tenn. 1950).