# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 8, 2012 Session

## STATE OF TENNESSEE v. YONI SALES BARAHONA

**Appeal from the Criminal Court for Davidson County**
**No. 2010-A-553     J. Randall Wyatt, Judge**

_____

**No. M2011-01300-CCA-R3-CD - Filed August 13, 2012**

_____

Aggrieved of his conviction of aggravated assault and accompanying 10-year sentence of incarceration, the defendant, Yoni Sales Barahona, appeals, alleging some 21 assignments of error. Some of the issues have been waived, and others are redundant. The defendant's reviewable challenges are these: (1) the trial court erred by denying the motion to suppress, (2) the trial court erred by admitting into evidence the preliminary hearing testimony of the victim, (3) the trial court erred by admitting the identification of the defendant by both the victim and a witness, (4) the trial court erred by admitting into evidence a knife recovered from the scene, (5) the evidence was insufficient to support his conviction, and (6) the sentence is excessive. Discerning no error in either the conviction or the sentence, we affirm the judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Willis Jones, Nashville, Tennessee, for the appellant, Yoni Sales Barahona.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Robert Homlar, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant's conviction of aggravated assault relates to the stabbing of the victim, Jose Aguilar-Varagas, on November 21, 2009, at the Oasis night club in Nashville. At trial, club owner and manager Oscar Membreno testified that on November 21, 2009, he

saw "a group of people that were fighting inside the club," so he went outside to call the police. As he left, he "saw a young man that had a knife in his hand" and another individual "screaming that he had been cut or stabbed." Mr. Membreno identified the defendant as the person he had seen with a knife. He said that he did not see any other individual with a knife that night. He also identified a knife produced by the State as the knife police recovered from the women's restroom inside the night club on November 21, 2009. Mr. Membreno said that he saw "[t]he one that was bleeding" identify the defendant as the person who had stabbed him.

During cross-examination, Mr. Membreno said that there were approximately 60 people in the night club when the fight broke out among the 25 or so people who were standing near the pool tables. He testified that he employed two bouncers, but he had sent both home by the time the fight erupted. As a result, there were some people who had been permitted to enter the establishment without being searched for weapons. Mr. Membreno clarified that he did not see the defendant threaten anyone with the knife. He acknowledged that after the stabbing, the "friends of the wounded man" went outside and returned with "a machete." He said that the victim left the bar but returned when police arrived. He conceded that he did not see the defendant go into the women's restroom and that he had only seen the "silver" part of the knife that the defendant held. He said that he could not be sure that the knife recovered by police was the knife he saw in the defendant's hand.

Emergency room physician Doctor John Nixon testified that he treated the victim for "what appeared to be a superficial stab wound right below the naval."

Investigator Hugh Coleman of the Davidson County District Attorney General's Office testified that he was asked to locate the victim, Jose Oscar Aguilar-Varagas. He said that he consulted several databases using various spellings and word combinations similar to the victim's name along with similar dates of birth to obtain information relative to the victim. Utilizing the information he found, he traveled to several addresses that had been associated with the victim. Despite his efforts, he was not able to locate the victim.

At that point, the recording of the victim's preliminary hearing testimony was played for the jury. During that testimony, the victim testified that he had gone to the Oasis night club "to pick up some money" from a man he had been working for. He said that the defendant came up to him and asked him if he "belong[ed] to a marra." The victim said that when he told the defendant that he did not "belong to any marra," the defendant told the victim that he did and then "lifted up his shirt like this." In response, the victim lifted his own shirt, and the defendant said, "[O]h well that's pretty nice then." The victim then walked away from the defendant heading toward the restroom. At that point, the defendant, who had pulled a knife, came toward the victim's cousin. The victim said that he "pushed

[his] cousin aside," and the defendant stabbed him. He testified that he went outside the bar after being stabbed. The victim denied being a member of any gang. The victim said that he consumed only part of a single beer prior to the altercation and that the defendant did not appear to be intoxicated.

During cross-examination, the victim claimed that his employer instructed him to come to the diner adjoining the night club to get paid. He said that he did not talk to the defendant for very long and that he did not know the meaning of the word "marra," which apparently referenced gang membership. The victim said that he was at the club with his cousin, a friend, and a man whose name he did not know. He said that none of his companions was armed with a machete.

Metro Police Department Officer Clifton Huffmaster testified that he traveled to the Oasis night club in response to a call that an armed person was located on the premises. When he arrived, Mr. Membreno, who was waiting outside, told him that "there had been a stabbing and a fight and that the person who had done the stabbing was still inside of the night club." Once inside the establishment, Mr. Membreno identified the defendant as the perpetrator, and officers took the defendant into custody. Officer Huffmaster described the scene as "somewhat chaotic" and the patrons that remained at the bar as "still quite rowdy." He said that although the victim was not at the night club when officers first arrived, the victim "returned to the scene and identified the defendant as the [one] who had stabbed him." Officer Huffmaster testified that the victim had a puncture wound in his abdomen and that his shirt was bloody. Accordingly, he summoned an ambulance, and the victim was taken to the hospital. Officer Huffmaster said that officers discovered a knife inside the restroom at the night club. He could not say, however, that the knife recovered by officers was the weapon used to stab the victim. He did not see any blood on the defendant's person.

Detective Brandon Dozier, who was the lead investigator in the case, testified that by the time he arrived on the scene on November 21, 2009, patrol officers had taken control of the scene, the defendant was handcuffed in the back of a patrol car, and the victim had been taken to the hospital. He spoke briefly with the witnesses at the scene and with the defendant before going to the hospital to speak with the victim. Because the victim did not speak English, Detective Dozier "wasn't able to really speak to him" but did observe "injuries consistent with" descriptions provided at the scene. He said that the hole in the victim's shirt was consistent with the blade of the knife recovered at the scene. As part of his investigation, he photographed the defendant to confirm the victim's description of the defendant's tattooed abdomen.

On the basis of this proof, the jury convicted the defendant as charged of aggravated assault. Following a sentencing hearing, the trial court imposed a Range II

sentence of 10 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant lists some 21 individual assignments of error. The vast majority of these claims are redundant and can be synthesized into six claims for relief: (1) the trial court erred by admitting into evidence the transcript of the victim's preliminary hearing testimony, (2) the trial court erred by denying his motion to suppress, (3) the trial court erred by admitting into evidence the in-court and out-of-court identifications of the defendant by both the victim and Mr. Membreno, (4) the trial court erred by admitting into evidence the knife recovered from the scene, (5) the evidence is insufficient to support his conviction, and (6) the trial court erred by imposing a fully-incarcerative 10-year sentence.

## I. Admission of Preliminary Hearing Transcript

The defendant contends that the trial court erred by admitting into evidence the transcript of the victim's testimony at the preliminary hearing, claiming that the State failed to establish that the victim was unavailable and that the admission of the transcript violated his constitutional right to confront the witnesses against him.

### A. Unavailability

The defendant argues that the State failed to establish the victim's unavailability by failing to show that it had utilized "[d]ue diligence in locating the victim." Other than making broad references to the constitution and the rules of criminal procedure and evidence, the defendant has failed, however, to support his claim with citation to relevant authorities and completely failed to provide any appropriate references to the record in his argument. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument, "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on; and . . . for each issue, a concise statement of the applicable standard of review"). Essentially, the "argument" presented equates only to a caption of an argument. In consequence, he has waived our consideration of whether the trial court erred by declaring the witness unavailable. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

-4-

*B. Confrontation*

The defendant also argues that admission of the transcript violated his constitutional right to confront the witnesses against him. The State contends that admission of the transcript did not create a constitutional violation because the defendant was afforded the opportunity to cross-examine the witness at the preliminary hearing.

Although the defendant's brief is perilously close to waiver due to his failure to include references to the pertinent portions of the record, we will address the issue given the relative brevity of the record. That being said, the defendant is not entitled to relief on this issue.

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court "'has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" *State v. Parker*, 350 S.W.3d 883, 897-98 (Tenn. 2011) (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006)); *see also State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court departed from decades' long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* In *Crawford*, the Court laid the groundwork for what came to be known as "the primary purpose" test for distinguishing testimonial statements from non-testimonial statements. The Court refined the test in later opinions:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006). The Court noted that objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties" is necessary to determine whether a statement is testimonial or non-testimonial. *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011).

Although the defendant invokes *Crawford* in support of his claimed Sixth Amendment violation, *Crawford* and its progeny are limited to those situations when the State offers into a evidence the out-of-court statement of a declarant that the defendant has not had the opportunity to cross-examine. *See Crawford*, 541 U.S. at 59 ("Testimonial statements of *witnesses absent from trial* have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (emphasis added)). The defendant complains that even though the victim was subject to cross-examination at the preliminary hearing, he was not subjected to as thorough a cross-examination as he might have been at trial. The Supreme Court has observed, however, that "successful cross-examination is not the constitutional guarantee." *United States v. Owens*, 484 U.S. 554, 560 (1988). Here, the victim was subjected to unrestricted cross-examination at the preliminary hearing by an attorney who represented the defendant in this very same case.

### C. Relevance

In a somewhat related claim, the defendant asserts that the trial court should not have admitted the transcript because it was unreliable and, therefore, irrelevant. Again, other than broad assertions of the rules of evidence, the defendant has failed to support this claim with citation to authorities or the relevant portions of the record. As such, the claim is waived.

He also contends that even if the transcript was relevant, which it most assuredly was, it's prejudicial value was outweighed by the danger of unfair prejudice. Other than this bare accusation, however, the claim is not supported by argument and is not supported by appropriate references to the record. Accordingly, it too is waived.

### II. Motion to Suppress

The defendant contends that the trial court erred by denying his motion to suppress because the record does not support the court's finding that the defendant's arrest was supported by probable cause. The defendant does not clearly articulate, however, what evidence he would like suppressed, asking only that this court "adhere to the finding in *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 314, 58 L. Ed. 652" regarding the exclusion of evidence obtained via an unlawful search or seizure. No evidence was obtained from the

defendant's person following his arrest, and the defendant provided no incriminating statement to police. Taking into account the many disjointed assignments of error related to the trial court's denial of the motion to suppress, we glean that the defendant objects to the victim's identification of the defendant as the perpetrator as the fruit of his allegedly illegal arrest. The defendant does not actually articulate this argument, and he makes no effort to discuss any possible relation or attenuation between what he deems to be an unlawful arrest and the identification made by the victim. Moreover, he has failed, again, to cite relevant authority on this issue or to make any reference at all to any portion of the record. Under these circumstances, he has waived our consideration of this issue.

### III. Identifications of the Defendant

The defendant challenges both the in-court and out-of-court identifications made by the victim and Mr. Membreno, arguing that the out-of-court identifications were unduly prejudicial and that the prejudicial nature of those identifications contaminated the later in-court identification testimony.

An identification procedure that is so impermissibly suggestive "as to give rise to a very substantial likelihood of irreparable misidentification" violates due process. *Simmons v. United States*, 390 U.S. 377, 384 (1968). Although it may be suggestive, an identification may satisfy due process as reliable and admissible if the totality of the circumstances so warrants. *See State v. Brown*, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). Five factors are to be considered when evaluating the propriety of the identification process. *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Bennett v. State*, 530 S.W.2d 511, 514 (Tenn. 1975). They are: (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty of the witness at the confrontation; and (5) the time between the crime and the confrontation. *Neil*, 409 U.S. at 199; *Brown*, 795 S.W.2d at 694.

### A. Mr. Membreno

The record establishes that immediately after officers arrived on the scene at the night club, Mr. Membreno led them inside and identified with certainty the defendant as the person who had possessed a knife during the fight. Mr. Membreno testified at trial that the fight occurred near the pool tables, a well-lit area of the night club. The totality of the circumstances thus supports a finding that Mr. Membreno's identification of the defendant was not unduly suggestive. Indeed, because it was orchestrated entirely by Mr. Membreno himself, the identification was not suggestive at all.

Because the initial identification was not suggestive, nothing prohibited Mr. Membreno from identifying the defendant at both the preliminary hearing and the trial as the perpetrator. The defendant is not entitled to relief on this issue.

## B. The Victim

The victim's identification of the defendant was more in the nature of a "show-up" identification because the defendant had been handcuffed and placed into the back of a police car before the identification was made. With a show-up, the police arrange an observation of the defendant by the victim. *State v. Dixon*, 656 S.W.2d 49, 51 (Tenn. Crim. App. 1983). A show-up as a form of identification of a defendant is, by its nature, inherently suggestive. *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). For that reason, the use of show-ups to establish the identification of a person suspected of committing a criminal offense has been repeatedly condemned absent special circumstances. *Id.* One such special circumstance is when the show-up occurs as an on-the-scene investigatory procedure shortly after the commission of the crime. *Id.*

Here, as the defendant sat handcuffed in the patrol car outside the night club less than half an hour after the stabbing, the victim walked onto the scene and identified the defendant as the perpetrator. The victim testified that he spoke with the defendant for a short time before the defendant stabbed him. Although the defendant was in police custody, having already been identified by Mr. Membreno, the police did not orchestrate the victim's identification of the defendant. Accordingly, we cannot say that the victim's initial out-of-court identification was made under circumstances so impermissibly suggestive "as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384. Furthermore, because the initial identification was not made under impermissibly suggestive conditions, the victim's in-court identification of the defendant remained untainted by improper conduct. Thus, the defendant is not entitled to relief on this issue.

## IV. Admission of Knife

Buried within the defendant's argument on his other issues is his claim that the trial court erred by admitting into evidence the knife recovered from the restroom inside the night club. Again, without any citation to authority other than a broad reference to Tennessee Rule of Evidence 403 or reference to the record, he complains that admission of the knife violated his constitutional right to a fair trial, that the knife was not relevant, and that, even if it was relevant, the probative value of the knife was outweighed by the danger of unfair prejudice. Because the defendant has not supported his claims with citation to relevant authorities or appropriate references to the record, he has waived our consideration of this issue.

*V. Sufficiency*

The defendant contends that the evidence adduced at trial failed to establish his identity as the perpetrator. The State asserts that the evidence was sufficient.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and [u]ses or displays a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(ii) (2006). The defendant acknowledges that the victim was stabbed, but he contends that the State failed to establish his identity as the perpetrator. The record establishes, however, that Mr. Membreno identified the defendant as the only person armed with a knife when the fight broke out inside the night club and that the victim identified the defendant as the perpetrator. The defendant is not entitled to relief on this issue.

*VI. Sentencing*

The defendant asserts that the trial court erred by imposing the maximum sentence within the range. The State contends that the record justifies the 10-year sentence.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the

sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration" to the appropriate "factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Since the 2005 revisions to our sentencing act rendered enhancement and mitigating factors advisory, appellate review does not extend to the weight afforded mitigating and enhancement factors by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

> In making its sentencing decision, the trial court was required to consider:
>
> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

At the sentencing hearing, Detective Dozier identified a number of photographs that he took of the defendant that depicted the defendant's numerous tattoos, most of which expressed the alphanumeric combination "MS13." Metro Detective Jason Cregan testified that MS-13 is an Hispanic gang with origins in El Salvador and that, when he first encountered the defendant, the defendant "was dressed like an MS member. He had a blue handkerchief around his neck [and] obvious signs of MS-13 tat[t]oos on him." The defendant told Detective Cregan that "he was jumped in [to the gang] in like around 1995." Detective Cregan said that although the defendant claimed that he was no longer affiliated with MS-13, "[i]t is common that if you drop your gang affiliation that especially in hispanic gangs that you cover them up, you can't, you know, display gang signatures if you are not a part of that gang." Detective Cregan described the defendant as "a MS doodle pad," noting that the defendant "had every MS tat[t]oo that you could think of on him." Detective Cregan said that the defendant had been entered into Metro's gang affiliation database as a confirmed member of MS-13 in 2006.

Detective Mark Anderson testified that in 1999, the defendant was convicted along with an individual named Escolastico Serrano of aggravated assault for the stabbing of a member of rival gang, Asian Pride. Detective Anderson said that the aggravated assault "was a gang[-]related incident," "[t]hey flashed gang signs at each other." He testified that Mr. Serrano was serving a 45-year federal prison sentence as a result of guilty pleas entered in conjunction with "an MS-13 RICO case."

Detective Anderson explained the significance of several of the defendant's tattoos. The acronym "TPLS," tattooed on the defendant's stomach, stood for "Thompson Place Locos Savatruchos," which Detective Anderson described as "the actual MS click that was indicted and eventually prosecuted successfully in the RICO case. . . . [T]hat was the main MS-13 gang that was here in Nashville at the time." He noted that the defendant had "numerous, numerous MS-13 tats," including some on his eyelids. He said that "MS with the three dots on his left hand" was "indicative of hispanic based ga[ngs], the three dots have several meanings in MS it means hospital, graveyard or penitentiary." Detective Anderson testified that he was "confident" that the defendant "is a tat[t]oo artist."

During cross-examination, Detective Anderson explained that "tat[t]oos are very very personal. [The defendant] is a tat[t]oo artist himself. If he had left the gang, he would have covered them up himself." He testified that the defendant "missed the RICO roundup" only because "he was deported twice."

Davidson County Sheriff's Department Officer Michael Graulau testified that his "first real contact" with the defendant was during "a shake down of the cell that he was

-11-

housed in." At that time, Officer Graulau discovered "a homemade tat[t]oo gun on his bunk as well as ink, actually a couple of bottles of ink, and some tat[t]oo stencils and some of the stencils were also of a gang nature. They were associated with the Gangster Disciples." On another occasion, the defendant, who was by that time housed "in special management," physically attacked another jailer and threatened Officer Graulau, telling Officer Graulau that he would kill him and his family.

The presentence report, entered as an exhibit at the sentencing hearing, established that the defendant had three prior convictions of aggravated assault and one federal conviction of illegal re-entry by a previously deported felon, for which he was on some form of release at the time of the offense. The defendant, a native of Honduras, had no verifiable employment or education history.

At the conclusion of the hearing, the trial court found that the defendant had previously failed to comply with a sentence involving release into the community, *see* T.C.A. § 40-35-114(8); that the felony involved the threat of death or serious bodily injury and the defendant was previously convicted of a felony involving death or serious bodily injury, *see id.* § 40-35-114(11); and that the defendant committed the crime while on some form of parole or judicially-ordered release, *see id.* § 40-35-114(13). The court noted that no mitigating factors applied and that the defendant's criminal history was "very very serious." The court sentenced the defendant as a Range II, multiple offender to 10 years' incarceration.

In our view, the record supports the imposition of a 10-year sentence. The defendant, a confirmed member of the MS-13 gang, had a history of assault convictions for offenses similar to the offense in this case as well as a conviction for illegally re-entering this country after having been deported. Detective Anderson testified that the defendant only missed being charged in a federal conspiracy because he was deported. Following his incarceration for this offense, the defendant flouted the rules of the jail by possessing tattoo materials and threatened the life of Officer Graulau and his family. The defendant's violent history, unsuccessful attempts at sentences involving release into the community, and unprovoked attack on the victim support the sentence imposed by the trial court.

*VII. Plain Error*

Lastly, the defendant points out that this court has the discretion to review for plain error any issues not properly preserved. Although this court does indeed possess the power to review the record for plain error, it is not the duty of this court to examine the record for possible error, craft the defendant's issues for him, imagine an argument supporting such issues, find authority to support said hypothetical claim, and then rule on the issue now fashioned wholly by this court. It is the duty, instead, of the appellant to review

the record for those issues most amenable to success on appeal and present those issues to this court supported by argument, citation to authorities, and appropriate references to the record. Despite enumerating better than 20 assignments of error, the defendant has only performed this duty for five issues. All others are waived and will not be considered by this court on appeal. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

*Conclusion*

The defendant has failed to establish any error by the trial court requiring reversal or that the evidence adduced at trial was insufficient to support his convictions. Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE