# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 16, 2014 Session

## STATE OF TENNESSEE v. DUSTIN MATTHEW LUCIO

**Direct Appeal from the Circuit Court for Sevier County**
**No. 15763-II     Richard R. Vance, Judge**

---

**No. E2014-00642-CCA-R3-CD - Filed March 31, 2015**

---

A Sevier County Circuit Court Jury convicted the appellant, Dustin Matthew Lucio, of aggravated rape, and the trial court sentenced him to twenty-three years in confinement to be served at 100%. On appeal, the appellant contends that the trial court erred by failing to suppress a suggestive pretrial identification of him as the perpetrator, that the trial court erred by refusing to allow him to introduce evidence of the victim's drug use to corroborate his version of the events, and that the evidence is insufficient to support the conviction. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ROGER A. PAGE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Robert L. Vogel (on appeal), Knoxville, Tennessee, and Michael Green (at trial), Sevierville, Tennessee, for the appellant, Dustin Matthew Lucio.

Robert E. Cooper, Jr., Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; James B. Dunn, District Attorney General; and Ashley McDermott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

At trial, the victim testified that on the day of the alleged incident, she worked at General Electric in Mascot. That night, she went "karaoking" with Judy Smith, who was her adoptive mother, and Joanna Stewart and Jessica Cervantes, who were Smith's biological

daughters. A.K.,[1] the fifteen-year-old niece of Stewart and Cervantes, stayed at Stewart's apartment to babysit Stewart's two young children. The four women went to two bars, and the victim consumed two and one-half alcoholic drinks before Smith announced that she wanted to go home. Smith drove the victim and Stewart back to Stewart's apartment and dropped them off.

The victim testified that she and Stewart did not go into Stewart's apartment. Instead, Stewart got into her car, told the victim that A.K. had agreed to watch the children all night, and left to go to her boyfriend's house. The victim did not want to drive home because she had been drinking alcohol, so she went into Stewart's apartment alone. She said that as soon as she entered, A.K. "jumped off the couch" in the living room and was "pointing" and "hollering." A.K. was intoxicated, was slurring her words, and could barely stand up straight. At the same time, the appellant came into the living room from the back of the apartment. A.K. screamed that "that's not my boyfriend," lay on the couch, and vomited into a trash can. The victim said, "I put her in my lap. I'm holding her hair back and I tried to get her some bread."

The victim testified that Stewart's apartment had two bedrooms and that Stewart's children were sleeping in the master bedroom. She said that she had never seen the appellant prior to that night, that he offered her a drink, and that he asked her name. The victim said she "played" with her telephone while A.K. remained passed out in her lap. The appellant asked if the victim had a boyfriend, and she told him yes. At that point, a male and female came out of the back bedroom. The victim did not know them and had been unaware they were there. The couple left, and the appellant followed them outside. The appellant came back into the apartment, put a twenty-dollar bill into A.K.'s hand, and told the victim to tell Stewart that Stewart did not have to pay the babysitter. The appellant left the apartment again, and the victim thought he would not return. A.K. remained on the couch with the victim.

The victim testified that the appellant came back into the apartment, told her that his friend had left a cellular telephone in the back bedroom, and went to the bedroom to look for it. The appellant asked the victim to call the phone so he could find it and gave her the telephone number. The victim dialed the number and went to the bedroom but could not hear the lost phone ringing. Suddenly, the lights in the room went out. She said that the appellant pushed her into the bedroom and that she fell onto the floor between a wall and a dresser. The appellant, who was behind her, shut the bedroom door, put his arm around her neck, and put his hand over her nose and mouth. The victim said that she could barely breathe, was kicking and screaming, and began to black out. The appellant told her that he would move

---

[1]Because the witness was a minor, we will refer to her by her initials.

his hand if she would stop screaming and do as he said.

The victim testified that she "[gave] up" and that the appellant told her to "move to the bed." The victim went to the bed, and the appellant told her to take off her pants. The victim said she told him that "you don't want to do this, I'm on my period." The appellant unbuckled her belt, pulled down her pants to her feet, and removed her shoes. He took off her underwear, got on top of her, and pulled down his pants. The victim said that she was crying and that the appellant put his penis into her vagina for five or six minutes. She said that during the incident, the appellant held her cellular telephone over her head and showed her a picture of her son that was on the phone. He told her, "[D]on't you want to be a good mother to your son, you will do as I say, whatever I say, whenever I say."

The victim testified that the appellant ejaculated. Afterward, he said that "this will make you feel better" and put his mouth on her vagina. The appellant's phone started ringing, so he pulled up his pants and told her not to move or he would get a knife from the kitchen and kill her. The appellant left the bedroom, and the victim got off the bed and looked for her underwear. The appellant returned to the room, told her to get back onto the bed, and told her that he had friends "coming to do the same thing to you." The victim said that she was scared and that the appellant left the bedroom again. The victim heard him go into the bathroom and shut the door, so she grabbed her underwear and put it on. She pulled up the window blinds, opened the window, and jumped through it.

The victim testified that she "took off running" to the apartment of Joe Mayton, who had raised A.K. as his daughter but was not A.K.'s biological father. The victim opened Mayton's unlocked front door and ran inside. She started screaming to Mayton that she had been raped and that A.K. and Stewart's children were still in Stewart's apartment with the appellant. Mayton called 911 and left. Shortly thereafter, the victim returned to Stewart's apartment. The police were there, and the victim told them what had happened. The victim went into the back bedroom and saw her pants, belt, and shoes on the floor. Later, she went to the hospital so that evidence could be collected for a rape kit. She also gave the police a statement at the hospital. She said that both of her lips were "busted" and that she had bruises on her back from hitting the dresser. At the conclusion of her direct examination testimony, the victim identified the appellant in court as the person who raped her.

On cross-examination, the victim testified that she was not "intoxicated drunk" but had "a buzz" that night. She denied drinking alcohol with the appellant and A.K., flirting with the appellant, or laughing with him. She also denied knowing that the appellant possessed Roxicodone prior to having sex with him or that he took her telephone as collateral for giving her the drug. She acknowledged that after the appellant knocked her down and grabbed her from behind, he let her go so she could move to the bed. The victim said that

she had started her menstrual period at one of the bars and that she had put toilet paper in her underwear because she did not have a tampon. However, the police did not recover the toilet paper from the apartment, and she did not know what happened to it. She acknowledged that she may have testified previously that she started her period three or four days before the incident.

On redirect examination, the victim testified that she had never seen A.K. intoxicated before that night and that the appellant was "in and out" of the apartment. After the appellant put the twenty-dollar bill into A.K.'s hand, he said he wanted to take A.K. to McDonald's. The victim told him, "[N]o, dude, she's passed out, she's unconscious, she ain't going nowhere, she's supposed to be here." The victim said the appellant was mad and acted like he was going to lift A.K. off the couch. The appellant's actions scared the victim, but she refused to let him take A.K. out of the apartment. The victim identified photographs of her injuries.

Jessica Cervantes testified that she had known the victim about ten years and that the victim began living with Cervantes' mother, Judy Smith, when the victim was about sixteen years old. On the night in question, Joe Mayton telephoned Cervantes. Cervantes missed his call, but he left a voicemail on her phone. In the voicemail, Mayton said A.K. had been drinking and had been raped, and Cervantes could hear someone hysterical and crying in the background. Cervantes called 911, reported that A.K. had been raped, and went to Joanna Stewart's apartment. She saw the victim sitting on the sidewalk and learned the victim, not A.K., had been raped. She said the victim was crying, shaking, and hysterical.

Joseph Mayton testified that he was A.K.'s father and lived in the Park Village apartments. Joanna Stewart also lived in the apartment complex. On February 20, 2009, Mayton and some friends were in his apartment when the victim "burst in the door" and said she had been raped. The victim was terrified and told Mayton that the appellant was in Stewart's apartment with A.K. and Stewart's children. She described the appellant as having short hair and a medium build and wearing jeans and a t-shirt. Mayton and one of his friends ran to Stewart's apartment, and Mayton knocked on the door. Mayton said that the appellant answered and that the appellant's face was "completely white." Mayton did not say anything to the appellant but "clocked" him on the head. Mayton and his friend scuffled with the appellant in the living room, and the fight continued into the parking lot. Mayton said A.K. "woke up out of her slumber," came outside, and told Mayton to stop. A.K. argued with Mayton, and he told her to go back inside. He said the appellant "got away" in the appellant's car, a white Eclipse.

On cross-examination, Mayton testified that the victim identified the appellant by name and that his fight with the appellant lasted about three minutes. On redirect

-4-

examination, Mayton testified that the victim came into his apartment wearing a shirt but no pants and that he gave her a pair of his shorts to wear. When A.K. came out of Stewart's apartment, she was stumbling, upset, and did not understand what was going on.

Sergeant Eric Ramsey of the Sevierville Police Department testified that in the early morning hours of February 20, 2009, he was dispatched to an apartment on Park Road. He was the first officer on the scene and spoke with Joe Mayton and the victim. Sergeant Ramsey went into Joanna Stewart's apartment and had the victim walk him through the event. The victim was crying and upset. He said that she was wearing a shirt and shorts and that her clothes were "kind of a mess." The victim's pants were on the bedroom floor, and a window beside the bed was open. Sergeant Ramsey collected a bed sheet because it had some stains on it. The victim told him that her attacker was "Dustin," but she did not know Dustin's last name. In talking with other people at the apartment, Sergeant Ramsey learned that Dustin's last name was "Lucio." He ran a driver's license check on the name and pulled up a photograph of the appellant.

Sergeant Ramsey testified that he took the victim to the emergency room (ER) so that evidence could be collected for a rape kit. The victim had a "busted" lip, scratches and abrasions on her back, and a mark on her neck. Sergeant Ramsey showed the appellant's photograph to the victim in the ER, and she "said that was the right Dustin Lucio." The following night, Sergeant Ramsey had the appellant arrested and brought to the police department. The appellant waived his rights and gave a brief statement. In the statement, the appellant claimed he was intoxicated and did not remember what had happened with the victim. Sergeant Ramsey told the appellant that he was being accused of rape, and the appellant showed no emotion. Sergeant Ramsey explained, "He kind of was just like, well, doesn't sound like me but I guess if I did it, shame on me." Sergeant Ramsey later collected buccal swabs from the appellant.

On cross-examination, Sergeant Ramsey testified that he did not collect a "maxi pad" or toilet paper from Stewart's apartment and did not see bloody toilet paper in the bedroom. He acknowledged that an intoxicated minor was present and said that the minor was not cited for underage consumption of alcohol. The victim had claimed that the rape started on the bed and moved to the floor. The appellant did not admit or deny the victim's allegations and said he could not remember. The victim told Sergeant Ramsey that she had been drinking alcohol, but she did not appear to be intoxicated.

Dr. Kevin Stasney testified as an expert in emergency medicine that he treated the victim in the ER in the early morning hours of February 20, 2009. He interviewed the victim, and she told him the following: The victim had been drinking alcohol with a friend and went to "Joanna's" apartment. A fifteen- to sixteen-year-old niece was present and was

intoxicated and vomiting. A male came out of the back bedroom. A second male and a female also came out of the bedroom. The two males got mad at the victim but left the apartment. One of them returned, and the victim checked all of the rooms, looking for a cell phone. She went into a bedroom, and the male pushed her into the room and locked the door. He put his hand over her mouth, removed her pants, and threatened to kill her with a knife. He put his penis inside her and ejaculated, and "spots were on the sheet." The male left the room and threatened her again. The victim escaped through a window and was wearing a robe and shorts. She said that the man "tried to perform oral sex after sex became painful" and that he may have scratches on his hand.

Dr. Stasney testified that the victim had an abrasion on the right side of her back and a small abrasion on her upper and lower lips. The victim was tearful and crying, and matter in her nose was probably dried mucus, not a pill. Dr. Stasney collected evidence for a rape kit, including the victim's pubic hair and samples from inside and outside her vagina and rectum. The victim complained to a nurse of painful urination. Dr. Stasney said painful urination could have been caused by a urinary tract infection or trauma. The nurse noticed blood at the victim's urethral meatus, which was the opening where the bladder excreted urine, and noted tenderness in the victim's pelvic area, an abrasion on the victim's back, and a lesion on the victim's mouth. The victim was having her period. Dr. Stasney said that she did not appear to be under the influence of alcohol and that she was able to answer his questions and follow directions.

On cross-examination, Dr. Stasney testified that he did not draw blood from the victim or order a toxicology report. The victim's pulse was elevated, and the blood at her urethral meatus was consistent with trauma or her period.

Jennifer Millsaps, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in serology testing that she received the victim's rape kit, a bed sheet, the victim's clothing, and DNA swabs from the appellant. Agent Millsaps analyzed a vaginal slide from the victim and found sperm. She compared the DNA from the sperm to the appellant's DNA, and the profiles matched. She said the probability of someone having the same DNA profile as the appellant exceeded the world's population. Given that the sperm in the victim came from the appellant, Agent Millsaps did not analyze any other evidence. On cross-examination, Agent Millsaps testified that she did not know how the appellant's sperm got into the victim's vagina.

Heather Powell testified that she was the appellant's ex-girlfriend and that they had a son together. In February 2009, Powell and the appellant were no longer dating, but she was living with him. On the night of the alleged rape, Powell telephoned the appellant five or six times, but he did not answer. She finally spoke with him between 9:00 and 10:00 p.m.

and could hear male and female voices in the background. Between 3:00 and 3:30 a.m., Powell was awakened by a knock on the front door. When she answered it, the police were there and said they were looking for the appellant. Powell told them that she did not know where the appellant was located. Powell later telephoned the appellant, and he "seemed like he was rushed, there was a lot of commotion going on." She told him not to come home because the police had been there and were watching. One or two days later, Powell talked with the appellant about what had happened, and he told her that he had blacked out and did not remember. He said that he did not think he had raped the victim and that they had consensual sex. On cross-examination, Powell testified that after her last conversation with the appellant, she telephoned the police and told them that he was at the home of Adam Kerley.

Abigail Kerley, Adam Kerley's sister, testified that she met the appellant "[t]hrough some friends" and had known him about three years at the time of trial. Prior to the alleged rape, Abigail[2] "met up" with Adam and the appellant at the Rockin Raceway in Pigeon Forge. Abigail tried to get them to go home with her, but Adam and the appellant went to Ashley Johnson's house. The next morning, Adam and the appellant arrived at Abigail's home and "went straight to bed." The following morning, the police arrested the appellant.

Abigail testified that at some point, she telephoned the appellant and asked him about "what he had done." The appellant told her that "the drugs and alcohol made him do what he did that night." On March 22, 2009, Abigail had a second conversation with the appellant. The appellant told her that Johnson had taken him and Adam to the home of "that [A.K.] girl" and that the first time he ever saw the victim was in a courtroom. He told Abigail that "this is a bunch of [bulls***]" and that "I don't know what the [f***] the deal is." Later in the conversation, the appellant told her, "But the rape charge I am trying to beat right now. They don't have any evidence or any [bulls***] on me right now." Abigail said that when the appellant subsequently learned that she was going to be a witness for the State, he telephoned her, tried to get her "to go on his side," and told her that she "didn't need to go against him." He later telephoned her again and apologized for being "sort of angry" during their previous conversation. Abigail said she had never met the victim. At the conclusion of Abigail's testimony, the State rested its case.

Eighteen-year-old A.K. testified that she had known the victim "my whole entire life" and that the victim was "like my aunt." On the night in question, A.K. had just turned fifteen years old and was babysitting Joanna Stewart's children, who were sleeping in Stewart's bed. A.K. had met the appellant about two months previously and thought he was cute. While

---

[2]Because the witness shares a surname with her brother, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

A.K. was babysitting, Ashley Johnson sent A.K. a text, asking if she wanted to "hang out." A.K. replied yes, and Johnson brought Adam Kerley and the appellant with her to Stewart's apartment. The four of them consumed alcohol, and A.K. and the appellant got onto the floor while Johnson and Kerley went into the back bedroom. A.K. said that she and the appellant were "cuddling" and that she was "pretty drunk" and "about to pass out" when the victim came into the apartment. A.K. jumped up because she had not been expecting the victim, and the victim threatened to call A.K.'s aunt. A.K. began to get sick, and the victim got her a trash can and fed her some bread. A.K. said she passed out and remembered "waking up to [her] dad yelling." A.K. went to the door and saw the appellant driving away in a white car.

On cross-examination, A.K. testified that she did not know much about the appellant when he came to the apartment but knew he was older than she. The appellant "came off" as intoxicated because he was slurring his words. Otherwise, he acted normal. A.K. began to feel "nauseous" and lay on the floor, and the appellant got onto the floor with her. A.K. said that when the victim came into the apartment and saw the situation, the victim was "pretty mad."

A.K. testified that when she woke, she saw two people leaving in the appellant's car. She thought the people were the appellant and Adam Kerley. The victim was gone but later returned to the apartment. The victim "had snot everywhere," was crying and shaking, and could barely talk. A.K. went into the back bedroom and saw that "stuff was thrown everywhere." She said that the room was "completely destroyed" and that "[s]omething had definitely happened in the bedroom."

On redirect examination, A.K. testified that she did not know what was going on when she woke and that she did not see Joe Mayton fighting the appellant. A.K. did not see any toilet paper in the bedroom.

Ashley Johnson testified that she, the appellant, and Adam Kerley were at the apartment with A.K. She said she did not remember much about the victim's being there because she left when the victim arrived. She said, though, that she saw the appellant and the victim sitting on the couch and that the appellant had his arm around the victim. She acknowledged discussing this case with the assistant district attorney general and said that she told the general, "I left before it even happened."

On cross-examination, Johnson testified that at some point that night, she and Adam Kerley went into the back bedroom and had sex on the bed. However, Johnson was standing in the living room when the victim arrived. She acknowledged that after this incident, the appellant contacted her and "told [her] that he wanted [her] to say that [she] was there when [she wasn't]."

At the conclusion of Johnson's testimony, the jury convicted the appellant as charged of aggravated rape, a Class A felony. After a sentencing hearing, the trial court sentenced him to twenty-three years to be served at 100%.

## II. Analysis

### A. Suppression of Identification

The appellant contends that the trial court erred by allowing the victim's pretrial identification of him into evidence because Sergeant Ramsey's showing a single photograph to the victim was unduly suggestive. The State argues that the trial court did not err. We agree with the State.

Before trial, the appellant filed a motion to suppress the victim's pretrial identification of him because the identification was made from Sergeant Ramsey's showing her a single driver's license photograph. Before the State's opening statement at trial, the trial court held a hearing on the motion. During the hearing, the victim testified that after the alleged rape, the police arrived at Stewart's apartment. The victim gave Sergeant Ramsey a description of her attacker, telling him that the man's hair was dark brown and that his height was "just as tall as me, if not just a little taller." A.K. knew the appellant's name and gave it to Sergeant Ramsey. After the victim went to the hospital, the officer showed her a photograph of the appellant, and she identified him as the man who had raped her. The victim testified that she could have identified the appellant without seeing the photograph, and she identified him in court as the perpetrator. On cross-examination, the victim testified that Sergeant Ramsey showed the photograph to her about two hours after the incident and that he showed her only one photograph.

Upon being questioned by the trial court, the victim testified that she was in the appellant's presence about one and one-half hours "at the most." The trial court asked her if the area was lighted and if she was able to see the appellant clearly, and she answered yes. She said she had not seen him prior to that night. The victim stated that she was later shown a photograph array containing a different photograph of the appellant and that she identified his photograph again. She also identified him at his preliminary hearing. The trial court asked if she had any doubt that the appellant was the person who committed the crime, and she said no.

The trial court noted that single-photograph identifications generally were inadmissible. However, the court stated that in this case, the victim was in the appellant's presence for one and one-half hours and that the surroundings were lighted, which gave her an "extraordinary opportunity" to see him. The trial court noted that the victim subsequently

identified the appellant from a photograph array, at the preliminary hearing, and during the suppression hearing. The trial court found that under the totality of the circumstances, the victim's identifying the appellant from a single photograph was reliable and denied the motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Neil v. Biggers, the United States Supreme Court established a two-part analysis to assess the validity of a pretrial identification. 409 U.S. 188, 198-99 (1972). First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 (Tenn. 1998) (citing Simmons v. United States, 390 U.S. 377 (1968)). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Biggers, 409 U.S. at 198-99. In Biggers, the United States Supreme Court identified five factors for determining the reliability of an identification: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. 409 U.S. at 199-200; see also State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). If, using the Biggers standard, a pretrial confrontation was so impermissibly suggestive that it violated an accused's right to due process, both the out-of-court and in-court identifications are excluded. State v. Shanklin, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

A police officer's confronting a witness with a single photograph of a suspect is inherently suggestive. See State v. Billy Tate, No. E2012-02576-CCA-R3-CD, 2013 Tenn.

Crim. App. LEXIS 842, at *13 (Knoxville, Sept. 27, 2013) (quoting State v. Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989)). However, the witness's out-of-court and in-court identifications will be admissible if the trial court finds that the single-photograph identification was reliable under the Biggers factors. Id.

In this case, the victim testified that she was in the appellant's presence for one and one-half hours. They were in lighted surroundings for part of that time, and the victim could see the appellant's face clearly. After the crime, she told Joe Mayton that her attacker had short hair and a medium build and was wearing jeans and a t-shirt. At the suppression hearing, the victim said she described him to the police as having dark brown hair and being her height or "just a little taller." Nothing indicates that the victim's descriptions were inaccurate. The victim told Sergeant Ramsey at the apartment that her attacker's name was "Dustin." Sergeant Ramsey testified at trial that when he showed the appellant's photograph to the victim in the ER, she "said that that was the right Dustin Lucio." Finally, the victim made the identification shortly after the incident. Therefore, we conclude that the trial court did not err by finding that the victim's identification of the appellant was reliable.

## B. Victim's Drug Use

The appellant contends that the trial court erred by refusing to allow him to introduce evidence of the victim's history of drug abuse and use of drugs on the day in question to corroborate his version of events. We conclude that he is not entitled to relief.

Before trial, the State filed a motion to suppress medical records for the victim "regarding drug treatment which she attended months after the alleged rape" on the basis that the records were irrelevant and unduly prejudicial pursuant to Tennessee Rules of Evidence 402 and 403, respectively. A transcript for a hearing on the motion is not in the record before us. However, at the motion for new trial hearing, the State advised the trial court that a hearing on the motion was held in May 2011 and that the court "found that the drug treatment was outside of this time period of this incident and for that reason the Court found that that would not be allowed to come into trial."

During defense counsel's opening statement, he alleged as follows: Prior to the alleged crime, the victim and the appellant shared "a few drinks" and flirted on the couch. The victim learned the appellant was "holding pills, Roxicodone" and tried to "score" drugs by asking him for one of the pain pills. The appellant wanted money for the pill, but the victim did not have any money, so "she paid with the one thing she did have on her, herself." After they had consensual sex, the appellant took the victim's cellular telephone as collateral for the money he thought she still owed him. The victim was angry, "felt scorned," and accused the appellant of rape "to get even."

During Dr. Stasney's cross-examination testimony, defense counsel asked if he "took a social history that evening," and he answered yes. Defense counsel asked Dr. Stasney to read the social history from his notes, and the State objected, arguing that "[h]e's trying to get into her past [drug use]." The trial court stated that it had already ruled on that issue, and defense counsel responded, "Anything previous, I'm not trying to get in. I'm trying to establish for that evening." The trial court reviewed Dr. Stasney's notes and stated, "History is history. It doesn't specify right now and it doesn't give a time frame. You can't ask that. . . . You're getting too close to trying to get into what I've told you time and time again that you can't and I know that's what you're trying to do so don't, period."

The appellant contends that he should have been allowed to present evidence that the victim had been using drugs that night. He also contends that he "should have been allowed to introduce medical records of the victim that showed she went to drug rehab for an addiction to the same drugs that Mr. Lucio claimed he gave her in exchange for sex on the night in question."

Regarding the appellant's latter claim that he should have been allowed to introduce evidence that the victim later sought treatment for Roxicodone, the State filed a motion on the issue, the trial court held a hearing, and the trial court granted the motion. However, the appellant failed to include a transcript of the hearing in the appellate record. As this court has repeatedly stated, it is the appellant's duty to prepare a record which conveys a fair, accurate, and complete account of what transpired in the trial court which forms the basis of his appeal. See Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Without a transcript of the hearing, which would have included the parties' arguments, the evidence presented, and the trial court's oral findings, we cannot consider the merits of the issue. Furthermore, nothing in the record before us shows that the victim sought treatment for an addiction to the same drug that the appellant claimed to have given her on the night in question. Therefore, he is not entitled to relief.

As to the appellant's claim that he should have been allowed to present evidence of the victim's drug use before the alleged rape, evidence that the victim ingested Roxicodone prior to having sex with the appellant would have been highly relevant to his claim that they exchanged the drug in return for consensual sex. See Tenn. R. Evid. 402. Moreover, the probative value of the evidence would not have been substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. However, other than defense counsel's opening statement assertions, which are not evidence, nothing indicates that the victim ingested Roxicodone that night. On cross-examination, the victim denied knowing that the appellant possessed Roxicodone prior to having sex with him or that he took her phone as collateral

for giving her the drug. Dr. Stasney testified that blood was not drawn from the victim for a toxicology report. Additionally, the appellant did not include Dr. Stasney's notes about the victim's social history in the appellate record for our review. The appellant made no offer of proof regarding evidence that the victim ingested drugs prior to having sex with him. See Tenn. R. App. P. 36(a). Therefore, we conclude that he is not entitled to relief.

## C. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction because, although his DNA was found inside the victim, the State failed to prove that their sexual encounter was anything but consensual. In support of his claim, he contends that certain physical evidence, such as bruising on the victim's thighs, "grip prints" on her body, and sexual trauma, does not exist to support the victim's testimony that he forced her to have sexual intercourse. He also argues that, had the trial court allowed the defense to introduce evidence of the victim's drug use, he would have been able to demonstrate that she consented to having sex with him. We determined in the previous section that the trial court did not err regarding its rulings on the victim's drug use but will address the remainder of the appellant's sufficiency argument.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in this case, aggravated rape is defined as the unlawful sexual penetration of a victim by the defendant when "[t]he defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). "'Sexual penetration' means sexual intercourse, . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). This court has previously stated that the term "unlawful" generally refers to non-consensual acts. See State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994).

At trial, the victim testified that the appellant turned off the bedroom light, pushed her onto the floor, grabbed her from behind, and put his hand over her mouth. He ordered her onto the bed and took off her underwear. The victim said that she was crying and that she told him she was having her period. Undeterred, the appellant pulled down his pants, penetrated her vagina with his penis, and ejaculated. The victim said that after the appellant left the room and went into the bathroom, she escaped through the bedroom window and ran to Joe Mayton's house. Mayton testified that the victim, wearing a shirt but no pants, burst into his apartment and said she had been raped. Mayton immediately went to the apartment and "clocked" the appellant. Dr. Stasney testified that he examined the victim and that she had an abrasion on her back and an abrasion on her upper and lower lips. The victim complained of painful urination, and Dr. Stasney said the pain could have been caused by trauma. When confronted by the police, the appellant did not deny raping the victim but said he could not remember. The jury, as was its prerogative, obviously accredited the victim's testimony, much of which was corroborated by other witnesses and the physical evidence. The evidence is more than sufficient to support the appellant's conviction.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE