**STATE of Tennessee, Appellee,**

v.

**Richard Allen THOMAS, Appellant.**

Court of Criminal Appeals of Tennessee,
at Knoxville.

July 28, 1989.

Permission to Appeal Denied by
Supreme Court Nov. 6, 1989.

John W. Cleveland, Sweetwater, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, C. Anthony Daughtrey, Asst. Atty. Gen., Nashville, Jerry N. Estes, Dist. Atty. Gen., Athens, William W. Reedy, Asst. Dist. Atty. Gen., Athens, for appellee.

OPINION

JONES, Judge.

The defendant, Richard Allen Thomas, was convicted of aggravated assault and attempt to commit a felony, robbery with a deadly weapon, by a jury of his peers. The trial court found that the defendant was a standard offender and imposed the following Range I sentences: six years in the Department of Correction for the offense of aggravated assault and three years in the Department of Correction for the offense of attempt to commit a felony. The trial court ordered that the two sentences are to be served concurrently. After the trial court denied the defendant's motion for a new trial, he appealed as of right to this Court pursuant to Rule 3(b), Tenn.R. App.P.

The defendant has raised four issues for our review. He contends that:

1. the planned one-on-one station house showup violated the due process clause of the Tennessee Constitution;

2. the in-court identifications made by the victim and her son were tainted by the showup and should not have been admitted into evidence;

3. the trial court should have granted his motion for judgment of acquittal because the in-court identification testimony was tainted, and, when this evidence is removed from the record, the identification of the defendant as the person who committed the offenses in question, is insufficient as a matter of law to support his convictions; and

4. this Court should declare and adopt a very strict, but narrow, rule of *per se* exclusion of planned one-on-one station house showups.

On the evening of January 31, 1988, the victim and her son attended services at their church. Upon their return home, the victim placed a take-out order with a local

restaurant. As the victim and her son were returning from the restaurant, they saw a red pick-up truck. Later, they noticed that the truck was following them. When they returned to their home and pulled into the driveway, the truck followed them into the driveway.

When the victim and her son exited their vehicle, both noticed that one of the occupants of the truck was standing beside a door with a "long gun," a rifle or a shotgun, in his hands. This person told the victim, "I came to rob you," and he instructed the victim to place her money on top of her car. The victim stated she did not have any money. However, she placed her billfold on top of the car. The assailant then asked the three remaining occupants of the truck how to load the gun. He subsequently told the victim: "I'm just joking. Forget the whole thing." When the victim's son ran inside the residence to obtain assistance, the assailant and his companions left. The victim subsequently called the police.

Officer Upton of the Sweetwater Police Department responded to the call. The victim gave the officer a general description of the truck and the assailant. She advised the officer that the assailant was wearing a white fishnet jersey with the word "Volunteers" across the front and there was a number on the jersey. Upton provided other officers with the description he had obtained by a radio broadcast. Approximately forty-five minutes later, Officer Long, while on routine patrol, saw a pick-up truck which matched the description of the truck included in the broadcast. The truck was parked next to a convenience store. The defendant, who was inside the store when Officer Long spotted the vehicle, returned to the truck.

Officer Long advised Upton that he had found a truck as well as a person meeting the description given in the broadcast. Officer Upton went to the convenience store to investigate. He subsequently placed the defendant in his cruiser and transported him to the police station. Officer Long had the owner of the truck and the remaining occupants follow him to the police station.

Officer Upton called the victim and told her that she needed "to come down to the police station and identify these boys that we picked up and see if these were [the ones] that [were] in your driveway." The victim and her son complied with the officer's request.

Officer Upton told the victim and her son that it appeared they had apprehended the individuals she described to him. Shortly thereafter, Upton took the victim and her son to view the defendant. He was alone in a small room. The victim's son, who was closest to the assailant, failed to make a positive identification of the defendant. He testified that he "couldn't really tell" whether the defendant was the assailant, "it sorta' looked like him," and he was "not really positive." The son's identification was based on the clothing the defendant was wearing and his identification of the pick-up truck, which was viewed after the showup. He candidly admitted that his identification of the defendant only became positive after he saw the pick-up truck. The victim testified that she "right off knowed that was him because of the jersey. I noticed the moustache, his face and everything. It was just like he was still standing in the driveway." She also identified the defendant's "gravely" voice when the defendant remonstrated and told her she had the wrong person. She became very upset and started crying.

Officer Upton testified that he thought about conducting a lineup. When asked why he didn't do so, he stated: "The reason I didn't do a lineup, it was close after the time the crime was committed, I didn't think there was any requirement to have a lineup, is the reason I didn't."

The defendant relied upon the defense of alibi. He testified that he was at the home of a friend when the offenses in question were committed.

The record reflects that the defendant was a passenger in a red pick-up truck earlier that morning. The owner of the pick-up truck was married, and his wife was living with her former husband. The wife was a neighbor of the victim. The owner of the truck harassed his wife and

her former husband. However, the truck and its occupants left the area shortly before noon. The defendant was taken to a friend's trailer and left. He was highly intoxicated at the time.

When the defendant's friend returned from the grocery store at approximately 3:00 p.m., the defendant was found lying on the front steps of the trailer. The friend and his wife helped the defendant inside the trailer, and he immediately fell asleep. The defendant awoke about 8:00 p.m. He left the trailer on foot at approximately 8:15 p.m. enroute to purchase cigarettes. While walking to a convenience store, the owner of the red pick-up truck saw the defendant, and gave him a ride to the convenience store. The defendant advised the owner of the truck he wanted to go home after he purchased the cigarettes, and the owner was going to give him a ride home before their encounter with the police.

▋ It has long been recognized that showups [1] are inherently suggestive and unfair to the accused. For this reason, the United States Supreme Court and this Court have repeatedly condemned the use of showups to establish the identification of a person suspected of committing a criminal offense [2] unless (a) there are imperative circumstances which necessitate a showup,[3] or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime.[4] As this Court said in *Marsh v. State*, 561 S.W.2d 767 (Tenn.Crim.App.1977):

> ... One-to-one lineups are condemned and their use is highly suspect ... In the case of *Donnie Russell Bradford v. State*, Court of Criminal Appeals No. 47,

filed February 18, 1977 at Knoxville, this Court ... held that in the absence of imperative circumstances, the presenting of a single suspect to a witness is proscribed.

561 S.W.2d at 769.

This Court has repeatedly warned that one-on-one station house showups must be abandoned.[5] In *Wadley v. State*, 634 S.W.2d 658 (Tenn.Crim.App.1982), this Court said:

> In the *Hampstead* case, our Court was concerned with an improper station house showup, very similar to the present showup, and significantly, that showup also concerned the East Ridge Police Department, the same police department concerned here. In our opinion in that case, we emphatically pointed out that these station house showups should be abandoned forthwith. Obviously, our warning in *Hampstead* has gone unheeded by the responsible law enforcement officials in Hamilton County. We again reiterate that these one-on-one station house showups must be abandoned, and the district attorney general for Hamilton County would be well advised to convey this message to the responsible officials of the East Ridge Police Department.

634 S.W.2d at 662.

In view of the pretrial identification procedure used in this case, this Court wonders how long it will take for law enforcement officers to heed the admonitions contained in *Hampstead* and *Wadley*.

Once a suspect has been taken to the station house, showups are proscribed, ab-

---

1. A "showup," also referred to as a one-on-one confrontation, occurs when "a single person is presented as a suspect to a viewing eyewitness." *United States v. Sanders,* 547 F.2d 1037, 1040 (8th Cir.1976), *cert. denied,* 431 U.S. 956, 97 S.Ct. 2679, 53 L.Ed.2d 273 (1977). *See United States v. Henderson,* 719 F.2d 934 (8th Cir.1983).

2. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Wadley v. State,* 634 S.W.2d 658 (Tenn.Crim.App.1982); *State v. Beal,* 614 S.W.2d 77 (Tenn.Crim.App.1981); *Marsh v. State,* 561 S.W.2d 767 (Tenn.Crim.App.1977). *See Maxwell v. State,* 501 S.W.2d 577 (Tenn. Crim.App.1973).

3. *Stovall v. Denno,* supra; *Forbes v. State,* 559 S.W.2d 318 (Tenn.1977); *State v. Moore,* 596 S.W.2d 841 (Tenn.Crim.App.1980).

4. *State v. Moore,* supra; *Johnson v. State,* 596 S.W.2d 97 (Tenn.Crim.App.1979); *Russell v. State,* 489 S.W.2d 535 (Tenn.Crim.App.1972); *Bracken v. State,* 489 S.W.2d 261 (Tenn.Crim. App.1972).

5. *Wadley v. State,* 634 S.W.2d 658, 662 (Tenn. Crim.App.1982); *Hampstead v. State,* No. 576 at Knoxville (Tenn.Crim.App. March 3, 1978).

sent imperative circumstances, regardless of the time that has elapsed between the offense and the showup.[6] Requiring a lineup or the presentation of a photographic spread after the suspect has been removed to the station house is not unreasonable. As a general rule, there are facilities at the station house for conducting lineups; and prisoners as well as others are generally available to be placed in a lineup with the suspect. Furthermore, showups increase the likelihood of misidentification.[7]

In this case, the station house showup was so impermissibly suggestive that it gave rise to "a very substantial likelihood of irreparable misidentification."[8] We reach this conclusion based upon (a) the statements by the investigating officer when summoning the victim to the station house and following the arrival of the victim and her son at the station house; (b) the nature of the pretrial identification procedure utilized; and (c) the circumstances surrounding the procedure.

When the investigating officer summoned the victim to the station house to view the defendant, he told the victim they had the man in custody who assaulted and attempted to rob her. Consequently, she went to the station house with the impression that the suspect she was to view was the person who had confronted her earlier that evening. When the victim and her son arrived at the station house, the officer told them: "We picked, we just seem like we may have got the fellows that you identified." Later he told them: "I want you to come back here and see if [the defendant] fits the description of this fellow we picked up." When the victim and the officer reached the room where the defendant was situated, the officer told her: "Here's this fellow." In summary, the investigating officer told the victim and her son that they had arrested the person who had assaulted and attempted to rob the victim; and the officer simply wanted them to confirm the appellant's identity.

When the victim and her son viewed the defendant, he was wearing the same clothes he wore when he allegedly committed the offenses in question; and he was apparently intoxicated. The victim predicated her identification of the defendant in part on the shirt worn by the appellant. Her son also appears to have based his identification on the clothing worn by the defendant.

The investigating officer admitted that he could have conducted a lineup. Adequate facilities were available for this purpose, and there were a sufficient number of people who could be placed in a lineup with the defendant. Furthermore, there is nothing contained in the record to indicate that there were imperative circumstances which required a showup.

■ Our finding that the pre-trial identification procedure was "impermissibly suggestive" and created a "substantial likelihood of irreparable misidentification" does not end the inquiry. We must now determine whether the State established an independent basis for the in-court identifications made by the victim and her son.

The simple question posed is whether, based upon the totality of the circumstances, these identifications were reliable.[9] In resolving this question, we are required to consider the following factors:

> ... the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[10]

6. *Wadley v. State,* supra; *Marsh v. State,* supra.

7. *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Forbes v. State,* supra; *Bennett v. State,* 530 S.W.2d 511, 515 (Tenn.1975).

8. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

9. *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. at 382, 34 L.Ed.2d at 411; *Forbes v. State,* supra; *Bennett v. State,* supra.

10. *Id.*

The victim and her son testified it was dark on the evening in question. However, there was a light on the side of the residence containing a 100 watt bulb. They viewed the assailant for approximately five minutes. The distance between the witnesses and the assailant was approximately 20 feet.

The witnesses viewed the assailant until the victim's son darted towards the residence to get help. The victim stated her attention was diverted to her son because she was afraid the victim would shoot him. The victim stated she was "terrified" and "just froze." Neither witness was able to determine whether the weapon held by the assailant was a shotgun or a rifle. Also, they were not able to identify the remaining occupants of the vehicle. The images of the occupants of the truck appeared as silhouettes.

According to the investigating officer, the only descriptions given by the victim related to the suspect's clothing and the truck. Their was no mention that the assailant was wearing a shirt under the jersey. Apparently the officer did not interview the victim's son.

The victim was certain that the defendant was the assailant. The victim's identification was apparently predicated upon the sound of the defendant's voice, a moustache, and the clothing he was wearing. The victim's son could not make a positive identification. The record reveals his identification was predicated upon the defendant's shirt, jeans, and the truck which he viewed following the showup.

Approximately an hour elapsed between the commission of the offense and the confrontation between the defendant and the witnesses.

We conclude that the fact the witnesses identified the defendant during a pretrial identification procedure, and the circumstances surrounding the procedure, should not have been admitted into evidence. As heretofore stated, the showup was impermissibly suggestive and gave rise to "a very substantial likelihood of irreparable misidentification."

The victim's in-court identification was marginally reliable based upon the above analysis. The in-court identification testimony of the victim's son was not reliable, and, therefore, should not have been introduced into evidence.

Since the only evidence linking the defendant to the commission of the crimes in question were the in-court identifications made by the two witnesses, it is the opinion of this Court that the defendant is entitled to a new trial. The admission of evidence concerning the pretrial identifications was highly prejudicial; and it helped bolster what appears to be a relatively weak identification.

The judgment of the trial court is reversed and this cause is remanded to the trial court for a new trial.

DAUGHTREY and BIRCH, JJ., concur.