IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2002

## STATE OF TENNESSEE v. RODNEY WILLIAMS

**Appeal from the Criminal Court for Shelby County**
**No. 99-09346    Chris Craft, Judge**

_____

**No. W2001-02606-CCA-R3-CD  - Filed September 18, 2002**
_____

The defendant, Rodney Williams, appeals his Shelby County Criminal Court conviction for aggravated robbery. He challenges the sufficiency of the convicting evidence and insists that the trial court erred in failing to suppress the victim's pretrial and in-court identification. We affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

A.C. Wharton, Jr., Public Defender; Garland Ergüden, Assistant Public Defender (on appeal); and Donna Armstard, Assistant Public Defender (at trial), for the Appellant, Rodney Williams.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; William L. Gibbons, District Attorney General; and Katrina Earley and Amy Weirich, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

Eleven-year-old Roderick Mitchell took his white pit bull puppy for a walk on Saturday morning, April 17, 1999. The puppy was a gift from Mitchell's father. When Mitchell left his house on Stacey Road in Shelby County about 10:00 a.m., he told his mother that he was taking the puppy and going across the street to the "Candy Lady's" house.[1]

According to the evidence at trial, viewed in the light most favorable to the state, when Mitchell crossed the street, he noticed a white car parked on the street. Mitchell had seen the car previously in the neighborhood, and on that Saturday morning he noticed two black males sitting in the vehicle. No one answered the door at Candy Lady's house, so Mitchell walked to Fairley High

---

[1] Evidently and as the name suggests, the owner of the residence kept candy on hand for children in the neighborhood who would come by to visit.

School to see if anyone was playing ball. Finding no one at the high school, Mitchell decided to return home. On Mitchell's return trek, the same white car pulled up, and the driver began questioning the boy about the puppy. The driver was alone in the car. Then, the defendant, operating a "fancy" red sports car, drove up. The defendant, whom the victim had seen before in the area, got out of the sports car and began asking about the puppy. The defendant demanded that Mitchell turn over the puppy; specifically the defendant leveled a gun at Mitchell's head and threatened to "blow [the boy's] m----- f------ head off."

After taking the dog at gun point, the defendant left in the red sports car. Mitchell saw the license plate on the defendant's car, and he ran home crying and repeating the tag number. Juanita Mitchell, the boy's mother, wrote down the license plate number and called the police. Memphis Police Department Communications received the call at 10:38 a.m. Officer Denise Kelly responded; she drove to the Mitchell residence and interviewed the boy and his mother. Officer Kelly testified at trial that Mitchell described the thief as a black male, wearing a white hat with glasses and a jheri curl and driving a red vehicle with Tennessee tag number 695 WNC. Officer Kelly broadcast the information about the robbery, including a description of the suspect and the vehicle.

Later that same day, Officer Sharron Childs was on patrol and spotted a red sports car with a spoiler on the rear. The sports car was heading southbound on Third Street. The tag number on the sports car was 695 ZWC. Officer Childs radioed a request for a registration check on the car, and she activated her emergency lights and siren. The red sports car ignored the signal to stop. Officer Childs followed the car and radioed a request for assistance. The sports car traveled several more blocks on Third Street, turned onto Parkrose, and stopped in front of a residence. The time of the stop was between 1:00 p.m. and 1:15 p.m. Officer Childs testified that when she initiated the stop she was "acting" on the earlier report of a dog theft. The officer admitted that the vehicle tag number for the theft broadcast differed slightly from the tag number on the car that she stopped.

Officer Ted Williams testified that he responded to a call to assist Officer Childs. When he arrived at Parkrose, at least two other police cars were present. Officer Williams said that there were two black males inside the red sports car, and he took charge of the defendant. The home address that the defendant provided was on the same street where the Mitchell family resided. Officer Williams testified that the sports car was searched, but neither the puppy nor a weapon was found.

The police arranged for Mitchell to be driven to Parkrose to see if he could identify the person who stole his puppy at gun point. Officer Williams testified that he was standing with the defendant outside the sports car and near the street curb. The other occupant of the sports car was standing nearby. Officer Williams related that when the boy arrived, but before the "formal" showup was arranged, that the boy spontaneously pointed in the defendant's direction and said, "That's him, that's him." Mitchell again picked the defendant during the more formal identification, which Officer Williams referred to as "a single shot," when Mitchell was placed inside a patrol car and driven past the area where the defendant was located.

The defendant did not testify at trial, but he called three witnesses as part of his defense. Eric Greenlee owned the red 1996 Mirage sports car that the defendant was driving when arrested. Greenlee testified that he loaned the car to the defendant on April 17, and when the defendant did not return, Greenlee called the police to report the car as stolen. After the defendant was stopped, Greenlee was transported to the scene to see if he could identify the driver. Greenlee identified the defendant, but he did not prosecute charges because he only wanted the return of his vehicle. Greenlee denied that the defendant gave him drugs or money in exchange for borrowing the car; Greenlee testified that he loaned the car "out of the kindness of [his] heart."

Kenneth Greer was a passenger in the red sports car when it was stopped on Parkrose. Greer and the defendant had been friends for a long time. Greer testified that before April 17, the last time he had seen the defendant was about three months earlier. According to Greer, the defendant drove into his driveway around noon on April 17. Greer did not recognize the car, but he did recognize the defendant. Greer testified that he was preparing to take his goddaughter home, and instead of walking, he asked the defendant to drive them. After the men delivered the girl to her house, they bought fast food and drove back to Greer's house. Greer testified that nothing happened on the return trip to his house and that he never heard any sirens or saw any police cars. Greer said that when they drove into his driveway, the police surrounded them and told them to get out of the vehicle. Greer kept several German Shepherd dogs in his back yard, and the police searched the yard for Mitchell's puppy. The puppy was never found, and Greer claimed that he never saw a puppy that day.

The final defense witness was Wynona Woodruff, who worked in the Communications Division of the Memphis Police Department. She brought and testified from two reports received on April 17. On April 17, at 10:39 a.m., the Mitchell robbery call was received. Around 11:12 a.m., a broadcast was made describing the suspect and the vehicle with "possibly a Tennessee tag 695 WNC." At 12:37 p.m., another call was received reporting that a suspect had assaulted Eric Greenlee and had taken his 1997 red, two-door Mirage automobile.

Based on the evidence and testimony, the jury convicted the defendant of aggravated robbery. The defendant was sentenced on September 7, 2001. He stipulated that he qualified for Range II sentencing. The trial court ordered the defendant to serve an incarcerative sentence of eighteen years with the Department of Correction. The defendant timely appealed, and he is claiming that the trial court should have suppressed the identification testimony given by the victim, Roderick Mitchell, and that the evidence is legally insufficient to support his conviction. We will consider these claims in the order presented by the defendant.

## I. Identification Testimony

In his first issue, the defendant attacks the victim's pretrial and in-court identification of him as the person who stole the puppy at gun point. The defendant complains that the "showup" procedure in this case, whereby the police requested that the minor victim come to Parkrose and view the men stopped in the red sports car, was impermissibly suggestive, violated his due process rights, and poisoned the subsequent in-court identification.

"To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998) (citing *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967 (1968)). In *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375 (1972), the Supreme Court identified five factors for assessing the reliability, and therefore the admissibility, of an identification. They are: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. *Id*. at 199, 93 S. Ct. at 382. These factors for evaluating the reliability of an identification have been adopted in this state. *See Rippy v. State*, 550 S.W.2d 636, 640 (Tenn. 1977); *Bennett v. State*, 530 S.W.2d 511, 515 (Tenn. 1975).

Law enforcement makes routine use of various identification procedures. With physical and pictorial lineups, a victim is asked to examine the likeness of multiple individuals and to indicate whether the perpetrator is among those individuals presented. These are the preferred methods of identification. *See Cribbs*, 967 S.W.2d at 794. With a showup, the police arrange an observation of the defendant by the victim. *State v. Dixon*, 656 S.W.2d 49, 51 (Tenn. Crim. App. 1983); *see Cribbs*, 967 S.W.2d at 794 (describing a showup as the victim either being presented with the suspect or a single photograph of the suspect). The showup method of identification is regarded as inherently suggestive. *See State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). As such, its use to identify a person suspected of committing an offense is disfavored "unless (a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." *Id*. (footnotes omitted).

In this case, the victim was shown both men who were in the red sports car at the time it was stopped. As an initial matter, it is somewhat debatable whether this arrangement qualified as a one-on-one confrontation whereby a single individual was presented as a suspect to a viewing eyewitness. The parties and the trial court, we note, never raised a question in this regard. Because the pretrial identification in this case – however it might be classified -- was treated as inherently suggestive and analyzed from the most critical perspective, we deem it unnecessary at this time to dwell on the defining features of the showup method of identification.

The trial court in this case conducted an evidentiary hearing on the admissibility of the victim's pretrial identification of the defendant. The victim testified at the hearing, as did Officer Williams and the defendant. There was conflicting testimony whether the defendant and his companion were standing outside the sports car when Mitchell made his identification or whether the men were sitting inside the police car. Regardless, by all accounts, Mitchell had no difficulty

identifying the defendant. Indeed, according to the defendant's testimony, "He come – looked dead at me, and said, 'Yeah, that's the one.'"

Both at the hearing and at trial, the defense tried to capitalize on the various ways that the victim had described the hairstyle of the man who stole his puppy. Also, the defense tried to suggest that either the police or the victim's mother had coached the victim about his identification. The victim, however, was firm in his insistence that no one told him who to identify.

At the conclusion of the hearing, the trial court made detailed findings that addressed the pertinent legal criteria. Our review, at this stage, is quite narrow. Unless the evidence preponderates otherwise, the trial court's findings of fact on suppression issues are to be affirmed. *See State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The trial judge is entrusted to decide questions of witness credibility and to resolve conflicts in the evidence. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). In conducting our review, the "[t]estimony presented at trial may be considered . . . in deciding the propriety of the trial court's ruling on a motion to suppress." *State v. Perry*, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). Our review of a trial court's application of law to the facts, however, is conducted under a *de novo* standard of review. *See Walton*, 41 S.W.3d at 81.

The trial court in this case properly recognized the inherently suggestive nature of showup identifications. The trial court then pointed out that the situation was one in which the victim could be brought to the defendant's location quickly and easily to resolve whether either of the individuals was responsible. "And in fact," the trial court noted, "one of them was cleared by this victim, and the other one was identified." Nothing in the evidence raised suspicion that the showup was anything other than "an on-the-scene investigatory procedure shortly after the commission of the crime." *Thomas*, 780 S.W.2d at 381.

The trial court also addressed the factors set forth in *Neil v. Biggers*. Regarding the opportunity of the victim to view the perpetrator at the time of the offense and the witness's degree of attention, the trial court found that the boy's "attention to detail was pretty remarkable under the circumstances." The trial court explained that the victim

> was able to describe the basic size of his assailant, the race, the gender, baseball cap, glasses, the description of the gun that was pointed at him, the description of the – the color of the car, the license-plate number, the other car, the other occupants, the fact that initially there were two occupants and then later just one occupant. It seems to me like he paid pretty darn close attention.

Furthermore, we note that according to the evidence, the robbery occurred during the day, when visibility was good. The exchange between the victim and the robber gave the victim ample opportunity to view the perpetrator. Also, it is significant that the victim testified at trial that he had seen the defendant in the neighborhood on previous occasions.

As for the accuracy of the victim's prior description and the victim's level of certainty in making the identification, the trial court did not find the hairstyle descriptions to be particularly significant. "[The victim] said [the thief] had . . . a baseball cap and glasses -- two items which can pretty easily be removed and disposed of. . . . [I]t's not like he had a tattoo on his forehead that he couldn't scrub off . . . , so I'm not sure what the point is on all of that." From all of the testimony presented, the trial court further found that the victim was certain in his identification of the defendant.

Under the circumstances shown to have existed and weighing the relevant criteria, the trial court concluded that the Parkrose showup was properly conducted and that the victim's identification was reliable and, therefore, admissible at trial. Our review convinces us that the trial court applied the correct legal standards and that the evidence does not preponderate against its ruling.

The defendant also challenges the admissibility of the victim's in-court identification of the defendant on the ground that it was tainted by the pretrial showup identification procedure. As we have explained, while the showup procedure was inherently suggestive, it was not so "impermissibly suggestive" as to create "a substantial likelihood of irreparable misidentification." *Cribbs*, 967 S.W.2d at 794. Consequently, we find no error in the admission of the victim's in-court identification.

## II. Sufficiency of the Evidence

In his final issue, the defendant challenges the sufficiency of the convicting evidence. His argument is entwined with his position that the identification testimony by the victim in this case should have been suppressed. Without the identification evidence, the defendant argues that the remaining evidence is insufficient to convict him of aggravated robbery. We disagree.

The defendant has miscast his issue as an evidence sufficiency claim. Whether the evidence at trial is legally sufficient to support the verdict is examined in light of the evidence actually presented to the jury. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981), *overruled in part on other grounds by State v. Leveye*, 796 S.W.2d 948, 953 (Tenn. 1990). Evidence that a defendant maintains was improperly admitted does not implicate the state's failure or success in proving its case. The remedy for the erroneous admission of prejudicially harmful evidence, therefore, is reversal for trial error, not dismissal of the conviction. *See Longstreet*, 619 S.W.2d at 100-01; *State v. William Binkley*, No. M2001-00404-CCA-R3-CD, slip op. at 4-5 (Tenn. Crim. App., Nashville, April 5, 2002).

Now having reviewed and considered the issues raised on appeal, we affirm the judgment of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE