IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 13, 2015 Session

## STATE OF TENNESSEE v. ALFONZO ROUNSAVILLE

**Appeal from the Criminal Court for Hamilton County
No. 286903     Don W. Poole, Judge**

---

**No. E2015-00033-CCA-R3-CD – Filed December 29, 2015**

---

The defendant, Alfonzo Rounsaville,[1] appeals from his Hamilton County Criminal Court jury conviction of aggravated robbery, claiming that the trial court erred by denying his pretrial motion to suppress an out-of-court identification, that the trial court erred by denying his motion for a mistrial, that the trial court erred by providing a jury instruction on the offense of aggravated robbery in light of the evidence adduced at trial, and that the evidence was insufficient to support his conviction. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Charles P. Dupree, Chattanooga, Tennessee, for the appellant, Alfonzo Rounsaville.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William H. Cox, III, District Attorney General; and Jason Demastus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Hamilton County Grand Jury charged the defendant with one count of aggravated robbery. The evidence at the defendant's trial established that shortly before 8:30 a.m. on November 30, 2012, Chattanooga resident Amy Andrews was walking from her house to her car to go to work when a man came up behind her and struck her with a rock. The victim struggled with her attacker, whom she described as a black man with a gray beard "wearing a black track suit with white piping," and he struck her in the left

---

[1] Whereas the court usually utilizes the defendant's name as it appears in the indictment, substantial evidence in the records shows that the defendant's surname is spelled "Rounsaville" and not "Rousnsaville" as it appears in the indictment.

side of her face with his closed fist. The victim yelled for the man to take her purse, which contained her cellular telephone, driver's license, credit cards, and 11 "very crisp dollar bills." The man then fled on foot from the victim's residence.

Just around the corner, Darin Howard was taking his trash to the curb when he saw a man run by carrying a woman's purse. Mr. Howard pursued the man, who was wearing dark clothing with reflective piping on his jacket, boots, and a toboggan. When the man fell, Mr. Howard picked up the purse, and the man got up and ran away. Mr. Howard saw the victim's work identification card hanging from the purse, so he telephoned 9-1-1. As he was providing a description of the perpetrator to the 9-1-1 operator, Mr. Howard saw a patrol car and flagged it down. He provided the officers with a description of the perpetrator and pointed them in the direction of his flight.

Another neighbor who saw the victim just after the attack also telephoned 9-1-1. Officers and emergency medical personnel came to the victim's residence. The victim, who had bruising and swelling to the side of her face, was examined and cleared by the emergency medical personnel. Meanwhile, officers canvassed the area in the direction of the perpetrator's flight and discovered the victim's wallet and driver's license.

A short distance from the victim's residence, officers located and arrested the defendant, who was wearing a black track suit with reflective white piping, boots, and a toboggan. Officers asked Mr. Howard to look at the defendant as he sat in the patrol car to determine whether the defendant was the same man Mr. Howard had seen fleeing with the victim's purse. After asking specifically to view the defendant's shoes, Mr. Howard confirmed that the defendant was the perpetrator. Because the victim was too frightened to come outside, she did not view the defendant in the patrol car. Instead, officers brought the defendant's identification card inside her house and asked whether the photograph on that card depicted the man who had robbed her. She confirmed that the defendant was the perpetrator.

Based upon this evidence, the jury convicted the defendant as charged of aggravated robbery. Following a sentencing hearing, the trial court imposed a Range II sentence of 20 years to be served at 85 percent by operation of law. The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

In this appeal, the defendant contends that the trial court erred by denying his motion for mistrial and by denying his motion to suppress the out-of-court identifications made by the victim and Mr. Howard and that the evidence was insufficient to support his conviction.

*I. Motion for Mistrial*

The defendant asserts that the trial court erred by denying his motion for mistrial, which motion he made on grounds that the State made an improper commentary on his exercising his privilege against self-incrimination. The State avers that the trial court did not abuse its discretion by denying the defendant's motion.

During the direct examination of Chattanooga Police Department Officer Dale Taylor, Officer Taylor remarked that he "attempted to interview" the defendant, and then the prosecutor asked whether Officer Taylor had obtained a statement from the defendant. Officer Taylor said that he had not, and the defendant objected. The defendant moved for a mistrial, arguing that Officer Taylor had "twice talked about the [defendant] wouldn't talk to him, did he attempt to get a statement. This [defendant] exercised his constitutional right not to incriminate himself and the officer knows better." The prosecutor agreed to strike the question and asked for a curative instruction in lieu of the court's granting a mistrial. The court stated that it would discuss the motion for mistrial "later" but immediately provided the following instruction to the jury:

> Members of the jury, statements asked or answered concerning any statements made, allegedly, by the defendant, is not admissible, and inappropriate, shouldn't be asked, shouldn't be answered, so you are cautioned and instructed to disregard concerning anything, any statement, that was or was not made by the defendant. So you are instructed not to consider that.

After the State rested, the defendant renewed his motion for a mistrial. The court agreed that both the question and the officer's answer were inappropriate but denied the defendant's motion for a mistrial, finding that a mistrial was not warranted in light of the curative instruction. The defendant declined the trial court's offer to provide another, stronger cautionary instruction.

On appeal, the defendant contends that the trial court should have granted his motion for a mistrial following Officer Taylor's improper commentary on the defendant's right to remain silent.

The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, and this court will disturb the trial court's ruling in this regard only when there has been an abuse of the trial court's discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003)

(citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *Id.*

Although we certainly do not condone Officer Taylor's remark about the defendant's refusal to provide a statement or the prosecutor's improper question that emphasized the inappropriate testimony, *see generally Doyle v. Ohio*, 426 U.S. 610, 618 (1976) (declaring prosecution's exploitation of an arrested person's post-*Miranda* silence "fundamentally unfair and a deprivation of due process"); *State v. Transou*, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996) ("It is constitutionally impermissible for a prosecutor to comment upon an accused's silence during the course of a trial."), the defendant's objection cut the officer's testimony short, and the State immediately agreed to strike its improper question. The court also offered an immediate instruction cautioning the jurors that they should give no weight to any proof that the defendant did or did not provide a statement to the police following his arrest. Under these circumstances, the constitutionally impermissible commentary can be classified as harmless beyond a reasonable doubt, s*ee Transou*, 928 S.W.2d at 960 (holding that improper commentary on the defendant's silence was harmless beyond a reasonable doubt where "the comment was brief, the trial court found that the violation was not intentional, and the trial court gave a detailed curative instruction"), and the trial court did not abuse its discretion by refusing to grant the defendant's motion for a mistrial.

## II. Out-of-Court Identification

The defendant contends that the trial court should have granted his motion to suppress the out-of-court identifications provided by the victim and Mr. Howard on grounds that the show-up procedure utilized in this case was unduly suggestive. The State asserts that the procedure utilized in this case was not unduly suggestive and, alternatively, that the identification was reliable even if the identification procedure was unduly suggestive.

Prior to trial, the defendant moved the trial court to suppress the out-of-court identifications made by the victim, Mr. Howard, and a third witness.[2] At the hearing on the defendant's motion, the parties stipulated that the officers would testify

---

[2] The third witness did not testify at the hearing or at the defendant's trial.

-4-

consistently with the police reports. The information in those reports established that Mr. Howard told officers that the perpetrator was "a tall black male, wearing dark pants, a black toboggan and a black jacket with reflective stripes on the sleeve" and pointed them in the direction of the perpetrator's flight. Approximately 14 minutes after the initial 9-1-1 call, an officer located the defendant a short distance away running around a house. The defendant "was wearing black boots, black pants, black jacket with reflective stripes on the sleeve, and a black toboggan." Officers arrested the defendant and took him back to the scene, where he was positively identified by two witnesses and where 11 dollar bills were recovered from his person. Officers recovered the victim's wallet along a path between the location of the offense and the location of the defendant's arrest.

The victim testified that as she was preparing to leave for work on November 30, 2012, the defendant attacked her and hit her over the head with a rock. She screamed and began struggling with him as he tried to take her purse. He struck her in the face, and she fell to the ground. At that point, one of her neighbors came outside, and the defendant ran away. The defendant, who "was wearing a black track suit with white piping and a toboggan and had a gray beard," ran in the direction of Jefferson Park. She said that the defendant took her purse, which contained her telephone, her wallet, and 11 "very crisp dollar bills." When officers returned a short time later, they told her they had a man in custody and asked her to come outside and see if he was the perpetrator. She refused to go outside because she was too upset. The officer went outside and came back in with the defendant's identification. She identified the defendant as the perpetrator from that photograph.

Mr. Howard testified that he lived approximately half a block away from the victim. On the morning of the offense, he was taking out the trash when he saw the defendant run by very quickly carrying a woman's purse. The defendant was wearing dark clothing with reflective piping on his jacket, boots, and a toboggan. Mr. Howard immediately ran after the defendant. At one point, the defendant fell down and dropped the purse, and Mr. Howard picked it up. The defendant got back up and continued to run. After Mr. Howard realized the purse belonged to Ms. Andrews, he telephoned 9-1-1 to report the crime and provide a description of the perpetrator. As he was speaking with the 9-1-1 operator, Mr. Howard saw a police cruiser, so he hung up and gave his description to the patrol officers. He also pointed out the direction of the defendant's flight. Within 15 to 20 minutes, the police called Mr. Howard and asked him to meet them at the corner of 18th and Adams Streets to identify the defendant. He said,

> The patrol car pulled up and they asked me to identify him through the window, at what point I said, yeah, I believe that is the person, but I would like to see his shoes, because that was something that was vivid in my mind at the time, that

-5-

somebody would be sprinting in boots, so I wanted to see the shoes.

The officers opened the door to allow him to view the defendant's shoes. At that point, he made a positive identification.

At the conclusion of the hearing, the trial court took the motion under advisement. In a written order, the trial court denied the defendant's motion to suppress the out of court identifications, finding that "the totality of the circumstances suggests that they were reliable, despite the suggestiveness of the procedures." Specifically, the court observed,

> It was a bright morning. Mr. Howard had both reason and ample opportunity to observe the defendant. He saw the defendant running with a woman's purse and followed him closely for two to four hundred meters. . . . He gave police an accurate, detailed description of the suspect and pointed police in the direction of the suspect's flight. Thereafter, police apprehended the defendant and found the items missing from the purse between the scene of the crime and the point of apprehension and eleven crisp dollar bills on the defendant. Within minutes of the pursuit, he identified the defendant by his unusual boots.
>
> As for Ms. Andrews, although she did not notice the defendant at first and did not observe him as long as Mr. Howard did, he approached her from the front and was standing close to her when he struck her. Thus, she had a close, if brief, view of his face and reason to observe. Although her description of the defendant was less complete than that of Mr. Howard in the omission of the details of black toboggan and black boots, it was [an] accurate description and more complete than the police report indicates. In addition, she gave police an accurate, detailed description of the contents of her purse, including eleven crisp dollar bills that were found on the defendant. Like Mr. Howard, within minutes of the event, she identified the defendant from the photograph on his identification.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215,

-6-

217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

An identification procedure that is so impermissibly suggestive "as to give rise to a very substantial likelihood of irreparable misidentification" violates due process principles. *Simmons v. United States*, 390 U.S. 377, 384 (1968). Although it may be suggestive, an identification may satisfy due process requirements as reliable and admissible if the totality of the circumstances so warrants. *See State v. Brown*, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990). Following *Simmons*, the Court established a two-part analysis to assess the validity of a pre-trial identification. First, the trial court must determine whether the identification procedure was unduly suggestive. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. *Id.* at 198-99. Five factors are to be considered when evaluating the propriety of the identification process: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200.

With a "show-up" identification, the police arrange an observation of the defendant by the victim. *See State v. Dixon*, 656 S.W.2d 49, 51 (Tenn. Crim. App. 1983). A show-up as a form of identification of a defendant is, by its nature, inherently suggestive. *See State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). For that reason, the use of show-ups to establish the identification of a person suspected of committing a criminal offense has been repeatedly condemned absent special circumstances. *Id.* One such special circumstance is when the show-up occurs as an on-the-scene investigatory procedure shortly after the commission of the crime. *Id.* That is exactly what happened in this case. The defendant was arrested within minutes of the initial 9-1-1 call only a short distance from the scene of the crime wearing clothing exactly as described by the victim and Mr. Howard. Officers brought the defendant to Mr. Howard so that Mr. Howard could confirm or deny that the defendant was the man he had seen running with the victim's purse. Mr. Howard made a positive identification only after viewing the defendant's shoes, which he recalled as distinctive. The victim did not view the defendant inside the patrol car but did view the photograph on his identification card. Given that both witnesses gave particularly detailed and accurate

descriptions of the defendant, that he was apprehended within a short time only a short distance from the scene of the crime, and that both witnesses expressed great certainty in their identifications, the trial court did not err by denying the defendant's motion to suppress the out-of-court identifications provided by the victim and Mr. Howard.

### III. Sufficiency

Finally, the defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to establish that the robbery of the victim was accomplished by a deadly weapon. The State contends that the rock, in the manner that it was used by the defendant to attack the victim, qualified as a deadly weapon.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *Id.* Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, aggravated robbery is "robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). A deadly weapon is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(2). "'Serious bodily injury' means bodily injury that involves . . . [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or [a] broken bone of a child who is eight (8) years of age or less." *Id.* § 39-11-106(a)(34) (2010).

The evidence adduced at trial established that the defendant came upon the victim, struck her in the head with a rock, and took her purse. In our view, the rock, in the manner that it was used, striking the victim on the top of the head, was capable of causing death or serious bodily injury. *See Morgan v. State*, 415 S.W.2d 879, 882 (Tenn. 1967) (holding that "hard object wrapped in a sock and used as a bludgeon or club to assault a person in perpetration of a robbery and thereby endanger the person's life is a deadly weapon within the meaning of the statute"); *see also State v. Robinson*, 971 S.W.2d 30, 48 (Tenn. Crim. App. 1997) (observing that "a stick or brick" could be a deadly weapon for sentencing purposes); *State v. Matthew Joseph Carter*, No. E2009-00217-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Nov. 2, 2010) (affirming trial court's finding that a rock was a deadly weapon for sentencing purposes); *State v. William Herbert Stitts*, No. 02C01-9602-CC-00053, slip op. at 4-5 (Tenn. Crim. App., Jackson, Aug. 22, 1997) (affirming conviction of aggravated robbery via deadly weapon where victim testified that defendant "attacked her with a rock of some kind"); *State v. Timothy Jenkins*, No. 01C01-9508-CC-00269 (Tenn. Crim. App., Nashville, Nov. 15, 1996) (observing, "Rocks have, for centuries, been utilized as deadly weapons."). In consequence, the evidence was sufficient to support the defendant's conviction of aggravated robbery.

*Conclusion*

Based on the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE