IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 2, 2016

**STATE OF TENNESSEE v. MARICO MEANS**

**Appeal from the Criminal Court for Shelby County**
**No. 12-06018      Paula L. Skahan, Judge**

_____

**No. W2015-00989-CCA-R3-CD  -  Filed March 29, 2016**

_____

Defendant, Marico Means, appeals his conviction of aggravated robbery and his sentence of eight years and six months at eighty-five percent. He argues that the trial court erred by denying his motion to suppress evidence of the victim's pre-trial identifications and that the trial court erred by considering improper evidence during sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Charles Edgar Waldman, Memphis, Tennessee, for the appellant, Marico Means.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Muriel Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This is Defendant's direct appeal from his conviction for aggravated robbery and his sentence of eight years and six months as a standard offender. The following evidence was presented at trial.

Charnetta Taylor testified that she was thirty years old and lived in Memphis. On the afternoon of Sunday, March 20, 2012, Ms. Taylor was returning home from visiting her grandmother. Ms. Taylor parked her car on the side of the street near her house, and

then began walking up her driveway to her house. Ms. Taylor was carrying a dress, a pink bag, and a purse, which contained her wallet and cell phone. As she walked toward her house, she looked back and saw a car pull up behind hers on the street. A man opened the door on the back passenger's side and exited the car. The man was black and tall and wore a white t-shirt and red shorts. The man began moving toward Ms. Taylor in a "fast walk." Ms. Taylor saw a gun in his left hand by his side and was afraid. She dropped her things, screamed, and ran across the street. Ms. Taylor explained that she did not try to go inside her own house because she was worried that she would not have time to unlock the door and get inside safely. Ms. Taylor attempted to get inside her neighbors' house but could not, so she hid underneath the truck parked in their front yard. A couple of men came from the back of her neighbors' house and went to the truck. One of them let Ms. Taylor use a phone to call 911.

When Ms. Taylor looked back across the street to her driveway, she saw her things on the ground, but she did not see her purse, and she did not see the man with the gun or the car in which he arrived. Ms. Taylor's purse was never recovered.

Crime scene investigator Tristan Brown of the Memphis Police Department testified that, on May 20, 2012, he was dispatched to the crime scene. He found a cell phone and a pair of broken eyeglasses on the road near Ms. Taylor's car. Mr. Brown photographed these items and obtained some fingerprints from the cell phone, which he sent for further analysis. Those fingerprints did not yield an identifying match.

Detective Dressels Fox of the Memphis Police Department was assigned to this case the day after the incident occurred. Ms. Taylor denied that the phone or glasses belonged to her and said that she did not notice those items when she got out of her car. A few weeks after the incident, Detective Fox showed Ms. Taylor several photographs stored on the phone, and she identified Defendant as the man with the gun. Ms. Taylor testified that she "was able to get a good look at him so [she] knew what the person looked like." She did not know Defendant. In one of the photographs, Defendant was wearing a white t-shirt and red shorts. Defendant was not the only person in the photographs.

The name Marico Simpson was found in the phone's data. A text message sent to the phone at 12:43 a.m. on May 20, 2012, said, "I love you, Rico." Another text message, sent to the phone at 1:31 p.m. on the same day, said, "A, you want me to get Gary to take us to hit that lick goon." The term "lick" is commonly used to refer to a robbery. Eventually, Detective Fox learned that Defendant's name was Marico Means. Detective Fox composed a six photograph lineup containing a photograph of Defendant. On July 6, 2012, Detective Fox showed the lineup to Ms. Taylor, and she again identified Defendant out of the lineup as the man who approached her with a gun.

*Analysis*

Defendant raises two issues on appeal: (1) whether the trial court erred in denying his motion to suppress the victim's out-of-court identifications, and (2) whether the trial court abused its discretion by sentencing Defendant based on improper evidence. As to the first issue, Defendant asserts that the circumstances surrounding the victim's viewing of the cell phone photographs were impermissibly suggestive and that the victim's resulting identification of Defendant in the cell phone photographs and identification of Defendant in the six-photograph lineup were unreliable. The State argues that, even if the procedure used in the initial identification was impermissibly suggestive, the victim's identification was still admissible because it was sufficiently reliable under the circumstances.

To avoid exclusion from trial, "an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998) (citing *Simmons v. United States*, 390 U.S. 377 (1968)). Nonetheless, an identification that is made pursuant to a procedure that is conducted in an impermissibly suggestive manner will not be excluded if the witness's identification was reliable under the circumstances. *State v. Philpott*, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). Courts use a multi-factor inquiry to determine reliability, which includes "the opportunity of the witness to view the criminal at the time of the crime; the witness's degree of attention at the time of the crime; the accuracy of the witness's prior description; the level of certainty demonstrated at the confrontation; [and] the time elapsed between the crime and the confrontation." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)) (internal numbering omitted). At a suppression hearing, the findings of fact made by the trial court are binding on appellate review, unless the defendant makes a showing that the evidence contained in the record preponderates against them. *State v. Reid*, 213 S.W.3d 792, 825 (Tenn. 2006) (citations omitted).

Prior to trial, Defendant filed a motion to suppress the identification, and the trial court held a hearing. At the hearing, Ms. Taylor testified that she first noticed a car driving slowly down the street. When the car stopped behind her and she saw the man exiting the car, she "was trying to see maybe he wanted something or wanted directions, and that's how [she] got a good look at him." She could not recall how long she looked at the man, but it was "enough to figure out what he wanted." She estimated she may have looked at him for eight to ten seconds or ten to fifteen seconds before she ran away. Ms. Taylor told the police that the man "had on like some red shorts, a white t-shirt, [and] he was kind of built . . . but not big or skinny." The shorts were long "basketball shorts." She also reported that the man had "dark complexion." Ms. Taylor did not notice what kind of footwear the man was wearing and did not see a brand name or logo on his clothing. The man had a "low fade" haircut. Ms. Taylor also reported that the man who

approached her "was about six feet, two hundred and something pounds." Ms. Taylor did not see anyone else in the car from which the man came.

About a month after the incident, Ms. Taylor went to the police station, and was shown some photographs from the phone that was found at the crime scene. Ms. Taylor could not remember the exact number of photographs, but there were more than one or two. There was another black male beside Defendant in one of the photographs, and Ms. Taylor did not recognize him. Ms. Taylor recognized Defendant's face, but she did not know him and did not know his name. Detective Fox recalled that there were two or three different black males in the photographs. The photographs were in color, not black and white. Both Ms. Taylor and Detective Fox maintained that Detective Fox did not indicate that they thought anyone in the photographs was responsible for the incident; Detective Fox he "just wanted [Ms. Taylor] to identify to see if [she] recognize[d] anybody in the phone."

The cell phone was entered into evidence, and there were seventeen photographs on the phone. Detective Fox said that he showed the photos to Ms. Taylor "one by one." There were two other males in the photographs. The first photograph on the phone was not Defendant. The photograph that Ms. Taylor identified Defendant on the phone was not used in the subsequent lineup.

A few weeks later, Ms. Taylor returned to the police station and was shown a photograph lineup with "pictures of different people on there, and they told [her] to pick out the guy that was on there, and [she] picked him out and circled him." She also signed the bottom of the lineup. Ms. Taylor insisted that she "didn't forget his face from the beginning." Both Ms. Taylor and Detective Fox maintained that Detective Fox did not tell Ms. Taylor that the man who robbed her was in the lineup or that the man in the photographs on the cellphone was in the lineup.

After the hearing, the trial court took the matter under advisement and issued a written ruling denying the motion. The trial court found that the show up procedure used in showing the victim photographs of Defendant on the cell phone was suggestive, observing that "[t]here are no pictures on the recovered cell phone that display reasonable alternative choices other than the picture of Defendant." However, the trial court found that the victim's identification was nonetheless reliable and therefore admissible based on the following:

> Although Ms. Taylor had less than fifteen seconds to identify the man
> exiting the vehicle, it was daytime and she had an unobstructed view from
> her position as [the car] approached. Ms. Taylor admitted she concentrated
> on the gun, but the accuracy of her description offered at the scene—the
> white shirt and red shorts that the man holding the gun wore, the fact that

the cell phone was not on the road as she had initially exited her vehicle—indicate that she was quite aware of her surroundings at the time. The one-month span of time between the incident and Ms. Taylor's initial identification is a slightly negative factor. However, Ms. Taylor's certainty during the show-up and subsequent line-up procedures renders the identification sufficiently reliable.

We agree with the trial court. "It has long been recognized that showups are inherently suggestive and unfair to the accused." *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). The evidence does not preponderate against the trial court's finding that the procedure used in this case was impermissibly suggestive because, on the whole, the photographs on the phone unfairly and inordinately focused on Defendant, rather than presenting an unbiased array of individuals from which the victim could choose. In the photograph that the victim first identified Defendant, he was wearing what appeared to be the exact same outfit as the man who approached the victim with a gun.

However, as stated above, an identification may still be admissible as long as the record shows that the identification was reliable under the circumstances. *Philpott*, 882 S.W.2d at 400. Weighing the *Biggers* factors for reliability, the trial court found essentially that the victim (1) had an adequate opportunity to observe the perpetrator; (2) paid careful attention to the perpetrator as the crime unfolded; (3) gave a detailed and accurate description of the perpetrator when interviewed at the crime scene; and (4) identified Defendant with a high level of certainty. Although these four factors favored reliability, the trial court noted that the temporal distance between the crime and the identification militated slightly against reliability. We agree that the victim's pre-trial identification of Defendant was reliable despite the suggestiveness of the procedure used in this case. Defendant is not entitled to relief on this issue.

As to Defendant's second issue, he argues that his sentence of eight years and six months at eighty-five percent is excessive because the trial court improperly relied on evidence obtained from Defendant's Facebook page which suggests he is affiliated with a gang. At the sentencing hearing, the State introduced several photographs from Defendant's Facebook page. Two of the photographs show Defendant holding or displaying various quantities of cash. One photograph shows Defendant displaying a black pistol, and another shows Defendant holding what appears to be the magazine for a pistol. Three photographs show Defendant wearing a letterman jacket with "MOB MUZIK GANG" across the back. The "O" in "MOB" is replaced with a billiards eight ball. Two of these photos show the same words painted on a wall as a mural with "Boo Dirty" above them. Gang Expert Byron Willis of the Memphis Police Department testified that a rapper known as O.G. Boo Dirty was a member of the Young Mob, a criminal street gang in Memphis. Detective Willis also testified that the eight ball is a symbol associated with the Young Mob. In one of these three photographs, Defendant is flashing a gang

sign with his left hand, which Detective Willis said is associated with the Young Mob. In several other photographs, Defendant is flashing the same sign. Another photograph shows a tattoo of "MOB" with the eight ball on Defendant's left forearm. After hearing argument from the parties, the trial court found that Defendant was involved in criminal gang activity. The trial court also found that Defendant has a history of criminal behavior based on his criminal record which was contained in the presentence investigative report.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The defendant bears the burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *Bise*, 380 S.W.3d at 697-98 (citing T.C.A. § 40-35-210(b)). Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

Our supreme court has "continued to emphasize the need for trial courts to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *State v. King*, 432 S.W.3d 316, 322 (Tenn. 2014) (quoting *Bise*, 380 S.W.3d at 705-06 n.41). However, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the [sentencing act]. So long as there are other reasons consistent with the

purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Bise*, 380 S.W.3d at 706.

In this case, Defendant was convicted of aggravated robbery, a class B felony. T.C.A. § 39-13-402(b). The applicable sentencing range for a standard offender is eight to twelve years. T.C.A. § 40-35-112(a)(2). Even though Defendant was classified as a standard offender, the mandatory release eligibility for this particular crime is eighty-five percent. T.C.A. § 40-35-501(k)(1). Defendant was sentenced within the applicable range and received the proper release eligibility. The trial court found one enhancement factor applicable, that Defendant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." T.C.A. § 40-35-114(1). We cannot say that the trial court abused its discretion in sentencing Defendant. Although the trial court found that the evidence presented at the sentencing hearing supported the finding that Defendant was involved in gang activity as part of his history of criminal behavior, it also said that "[i]t's a very small thing out of the entire picture as an enhancement factor." Assuming, without deciding, that consideration of Defendant's gang affiliation was improper, the trial court's application of this enhancement factor is still supported by the record because Defendant has a prior misdemeanor conviction of theft under $500. The trial court did not "wholly depart[]" from our sentencing scheme, and Defendant's sentence is consistent with the purposes and principles of that scheme. *See Bise*, 380 S.W.3d at 706. Defendant is not entitled to relief on this basis.

## *Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE